FILED
CLERK, U S DISTRICT COURT

SEP 18 2002
2002

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**PENALTY**

Priority ✓
Send ✓
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC KIMBLE,<br><br>    Petitioner,<br><br>    v.<br><br>JEANNE WOODFORD, Warden of<br>   California State Prison at<br>   San Quentin,<br><br>    Respondent. | CASE NO. CV 90-4826 SVW<br><br>**DEATH PENALTY CASE**<br><br>ORDER ON PETITIONER'S<br>MOTION FOR EVIDENTIARY<br>HEARING AND CROSS-MOTIONS<br>FOR DISCOVERY<br>[Document Nos 118, 119, 122] |

Petitioner Eric Kimble challenges the constitutionality of his state court conviction and death sentence, and seeks an evidentiary hearing on his claims of incompetence to stand trial, ineffective assistance of counsel, and malfeasance of duty by the police, the prosecutor, and jurors. He also requests permission to conduct discovery in support of these claims. Respondent opposes these requests, but in the alternative, requests an opportunity to conduct reciprocal discovery if the Court determines that an evidentiary hearing is necessary.

For the reasons explained below, the Court GRANTS IN PART and DENIES IN PART the motion for evidentiary hearing. The Court DENIES WITHOUT PREJUDICE the cross-motions for discovery, and directs the parties to confer and attempt to agree on discovery to facilitate the evidentiary hearing.

ENTERED ON ICMS

9-23-02
SEP 23 2002

141

## I.     Background

### A.     The Crimes

On a Saturday afternoon, August 12, 1978, Harry and Avone Margulies were at their house in the Doheny Estates neighborhood of Los Angeles.  Between 4:00 p.m. and 4:45 p.m., someone entered their house, bound, gagged, and blindfolded the Margulies, and shot them dead.  Their bodies were found shortly thereafter.  Harry's body was fully clothed; Avone's was nude and semen was detected in her vagina.

One item was taken from the house:  a set of keys to Harry Margulies' stereo store, Beverly Stereo, which was located on Beverly Boulevard.  That evening, Beverly Stereo was burglarized.  There was no sign of a forced entry, but a silent alarm was triggered and reset several times during the evening, indicating that someone probably walked around opening and closing doors.  Approximately $7,000 worth of stereo equipment was stolen.

### B.     Arrests of Suspects

That same night around 11:30 p.m., a couple passing by Beverly Stereo observed a car driving slowly out of the alley behind the store, while someone ran alongside the car holding several boxes resting on the hood.  They recorded the car's license plate number, and gave it to the police two days later.  After determining that the car was registered to Ortez Winfrey, the police obtained a search warrant for Winfrey's house.  The search yielded a large number of stereo components that had been taken from Beverly Stereo.  The police arrested Winfrey on Wednesday, August 16, 1978, four days after the burglary.

During an interrogation at the police station, Winfrey said his friend Eric Kimble approached him late in the afternoon of Saturday, August 12th, and asked for help removing stereo equipment from the Beverly Stereo store.  Winfrey said Kimble showed him the keys to the store and explained that the store owner had asked him to remove the stereo equipment.  Winfrey agreed to help.  He admitted

1   that as the evening progressed, he eventually realized they were stealing the

2   equipment. Winfrey said a mutual acquaintance, William Grant, also helped

3   remove stereo equipment from the store.

4        The police compared latent fingerprints from the Margulies' residence to

5   police records of Kimble's fingerprints and found several matches. After

6   obtaining search warrants, they conducted a search and recovered additional stolen

7   stereo equipment at both Kimble's and Grant's residences. The keys to the stereo

8   store were found in Kimble's house. Both Kimble and Grant were arrested that

9   same day (*i.e.,* Wednesday, August 16, 1978, four days after the crimes).

10       Kimble initially agreed to speak to the police. He denied any involvement

11  in the stereo store burglary or the murders. As for the stereo equipment in his

12  house, he claimed to have purchased it from someone on the street. He disclaimed

13  any knowledge of the store keys found in his house. Kimble said he had never

14  been in the area of the city where the Margulies lived. When the officers indicated

15  they did not believe him, Kimble asked to see a lawyer and the interview ended.

16       Winfrey, Kimble, and Grant were each charged with the burglary of the

17  stereo store. Grant never made it to trial, however, as he was stabbed to death. (8

18  R.T. 2102; 9 R.T. 2278.) In exchange for Winfrey's testimony against Kimble, the

19  prosecution agreed to dismiss the charges against Winfrey. In addition to the

20  stereo store burglary, Kimble was charged with the burglary of the Margulies'

21  residence, the rape of Avone Margulies, and the robbery and murder of the

22  Margulies. (Clerk's Tr. 174-84.)

23       Seven separate special circumstances, each of which could independently

24  render Kimble eligible for the death penalty, were alleged. With respect to the

25  murder of Harry Margulies, these were robbery felony murder, burglary felony

26  murder, and multiple murder.[1] With respect to the murder of Avone Margulies,

27

28  [1] Former Cal. Pen. Code § 190.2(c)(3)(i) (robbery felony murder), § 190.2(c)(3)(v)
    (burglary felony murder), § 190.2(c)(5) (multiple murder).

1   the prosecutor alleged rape felony murder in addition to these three special

2   circumstances.[2] (Clerk's Tr. 174-84.)

3   ### C.   California's 1977 Death Penalty Law

4       Kimble was tried under California's 1977 death penalty law, which was

5   later substantially amended as a result of the voter's approval of Proposition 7 in

6   1978 (the "Briggs Initiative").  See People v. Kimble, 44 Cal. 3d 480, 488 (1988);

7   People v. Boyd, 38 Cal. 3d 762, 773 (1985) (discussing effect of Briggs initiative).

8   The 1977 law was similar to current law in its broad outlines:  If one or more

9   statutorily enumerated "special circumstances" is proved beyond a reasonable

10  doubt, then a defendant guilty of first degree murder must be sentenced either to

11  death or to life imprisonment without the possibility of parole.[3]  The case then

12  proceeds to a separate penalty phase, at which the prosecution may introduce

13  evidence in aggravation and the defendant may introduce evidence in mitigation,

14  to guide the jurors in deciding which penalty to impose.[4]

15      As the California Supreme Court has explained, one of the most significant

16  differences between the 1977 law and the 1978 law is the degree to which the jury

17  was free under the 1977 law to select a penalty without substantial guidance from

18  the statute:

19          The 1978 initiative . . . enacted a crucial change in the method
20      by which the jury determines whether to impose the death penalty . . .
        . Under the 1977 version of section 190.3, the jury must "consider,
21      take into account and be guided by the aggravating and mitigating
        circumstances" enumerated in that section.  The statute, however,
22      provided no further guidance or limitation on the jury's sentencing

23  _____

24  [2] Former Cal. Pen. Code § 190.2(c)(3)(iii) (rape felony murder).  On direct appeal, the
    California Supreme Court held the double-counting of the multiple murder special
25  circumstance was "excessive" and "improper" but ultimately harmless.  People v. Kimble,
    44 Cal. 3d 480, 504 (1988).
26
    [3] See Former Cal. Penal Code § 190.2; cf. Cal. Penal Code § 190.2 (1996); see also former
27  Cal. Penal Code § 190.4(a) (reasonable doubt standard applies to special circumstance
    findings).
28
    [4] See Former Cal. Penal Code § 190.3; cf. Cal. Penal Code § 190.3 (1978).

4

1  discretion.  In the absence of such a limitation, the jury was free, after
considering the listed aggravating and mitigating factors, to consider
2  any other matter it thought relevant to the penalty determination.  The
1978 initiative, by contrast, provided specifically that the jury "shall
3  impose a sentence of death if [it] concludes that the aggravating
circumstances outweigh the mitigating circumstances.  If [it]
4  determines that the mitigating circumstances outweigh the
aggravating circumstances [it] shall impose a sentence of confinement
5  in state prison for a term of life without the possibility of parole."

6  Boyd, 38 Cal. 3d at 773; see also Murtishaw v. Woodford, 255 F.3d 926, 961-64

7  (9th Cir. 2001) (discussing differences between 1977 and 1978 law).

8  **D.    Pretrial Counsel: Barry Jon Grumman**

9        Kimble was initially represented by Barry Jon Grumman, an attorney in

10  private practice.  The Kimble family appears to have privately retained Mr.

11  Grumman shortly after Kimble's arrest.  (See Clerk's Tr. 111-111A; 1 R.T. A32.)

12  Mr. Grumman represented Kimble for approximately ten months, until he was

13  relieved by the court on the eve of trial, June 25, 1979.

14        During the period that he represented Kimble, charges were pending against

15  Mr. Grumman for attempted receipt of stolen property.  In May 1978 (before

16  Kimble's crimes), Mr. Grumman was arrested in connection with a sting operation

17  run by the Los Angeles County District Attorney's Office, for knowingly

18  accepting stolen property as payment for legal fees.  An information was filed on

19  August 25, 1978 (9 days after Kimble's arrest).  In April 1979, Mr. Grumman

20  pleaded guilty to a misdemeanor violation of California Business and Professions

21  Code § 6128(a) (intentional deceit by an attorney to a party).  Mr. Grumman was

22  suspended from the practice of law on May 30, 1979.  Mr. Grumman did not

23  inform Kimble or the trial court about his legal difficulties until June 12, 1979.  (1

24  R.T. A32-A33.)

25        Kimble asserts that during the ten months that Mr. Grumman was

26  representing him, Mr. Grumman devoted considerable energy to extricating

27  himself from his own legal difficulties, but did almost nothing on Kimble's behalf.

28

5

1  **E.    Trial Counsel:  Richard Walton**

2          On June 12, 1979, when the trial court first learned of Mr. Grumman's

3  suspension, it appointed Richard Walton (an attorney in private practice) to advise

4  Kimble how to proceed.  Mr. Walton read Kimble's file, met Kimble in court the

5  next day, and briefly discussed the matter with him.  Kimble initially expressed an

6  interest in having one of Mr. Grumman's associates represent him, but was told

7  the associate lacked the necessary experience to try a capital case.  The matter was

8  continued to allow Kimble to make arrangements with another attorney.  (1 R.T.

9  A32-34.)

10         At the next hearing, on June 25, 1979, Kimble asked the trial court to

11 appoint Mr. Walton as his counsel, and the court did so.  (1 R.T. A36-39.)

12 **F.    Guilt Phase**

13         Following the appointment of Mr. Walton as trial counsel in June 1979, trial

14 was continued several times over the course of the next fifteen months.  Trial

15 commenced on October 9, 1980, before the Honorable David F. Cunningham of

16 the Los Angeles County Superior Court, with defendant's motion to quash the

17 search warrant.  (1 R.T. 1-127.)  Jury selection then ran from October 14, 1980,

18 through November 5, 1980.  (Clerk's Tr. 224-34; 1 R.T. 128 - 6 R.T. 1446.)

19 **1.    Prosecution Case**

20         The prosecution presented its case-in-chief over the course of thirteen

21 court days, from November 12, 1980, through December 4, 1980.  (Clerk's Tr.

22 235-49; 6 R.T. 1449 - 11 R.T. 2844.)

23 **a.    Homicide scene**

24         Harry and Avone Margulies lived on Nightingale Drive, a steep

25 and winding dead-end street off Doheny Drive, north of Sunset Boulevard in Los

26 Angeles.  At the time of their deaths, Harry Margulies was 61 and Avone

27 Margulies was 51 years old.  Harry Margulies owned and managed a stereo store,

28 Beverly Stereo, which was located on Beverly Boulevard, a few blocks east of La

1    Cienega Boulevard.  The Margulies' adult children, Patricia and Bill, lived with

2    them and worked full-time at the stereo store.

3         In the afternoon of Saturday, August 12, 1978, Harry and Avone Margulies

4    were home alone.  Bill Margulies spoke to his father by telephone around 4:00

5    p.m., and at that time, nothing seemed out of the ordinary.  At 4:45 p.m., however,

6    the alarm company notified the children, who were working at the store, that the

7    alarm at the Margulies' house had been triggered.  (6 R.T. 1575; 7 R.T. 1765.)

8         The front door of the Margulies' house had been left ajar.  There were no

9    signs of a forced entry.  The Margulies' bodies were in the front hallway.  Avone

10   Margulies' body was naked and her hands were tied behind her back with white

11   cord.  She was lying on her back.  Harry's body was clothed and his hands were

12   handcuffed behind him.  He was lying on his side.  Both had their eyes and mouths

13   covered with white adhesive tape.  (7 R.T. 1735-37, 1835-36; 8 R.T. 1897.)

14        Harry Margulies had been shot once in the chest with a .45 caliber bullet

15   that punctured his aorta, causing rapid blood loss.  The bullet exited his body at

16   the back, lower down on the body.  (This fact was used to conclude that the bullet

17   entered his chest at an approximately 30 degree downwards angle.)  He probably

18   collapsed immediately in the front hallway, where he was shot, and died within

19   five minutes.  Scrapes and bruises on his wrists indicated that he had earlier

20   struggled to free himself from the handcuffs that held his hands behind his back,

21   or that his hands had been pulled forcibly from behind.  (6 R.T. 1470-78; 7 R.T.

22   1853-55.)

23        Avone Margulies had also been shot once in the chest with a .45 caliber

24   bullet.  Because of the way the bullet passed through her body, she could have

25   survived for as long as 20 or 30 minutes, and could have moved around during

26   that time, although she would have been bleeding.  (6 R.T. 1493-95.)  A trail of

27   blood led from the den to her body in the front hall.  A .45 caliber bullet had been

28   fired in the den and lodged in the wall, and the couch in the den had a large

7

quantity of blood on it. (7 R.T. 1837-43.)  On the basis of this evidence, a police detective opined that Avone Margulies was probably shot while standing in the den, subsequently sat or lay on the couch, and eventually walked into the front hall, where she collapsed near the alarm system. (7 R.T. 1845-49, 8 R.T. 1927-33, 1952.)

An alarm key on a wall in the front hall had been turned and was jammed in the on position.  The key was about four feet off the ground, at the typical height of an electrical switch. (7 R.T. 1837; 8 R.T. 1965-71.)

Avone Margulies had had sexual intercourse less than six hours before death. (6 R.T. 1518-19.)  There was no evidence of trauma to the vaginal area. (6 R.T. 1525-26.)  Five small scrapes of the skin surface and a small bruise were found on her breasts, and a few other minor scrapes and bruises were found on her arms and upper body. (6 R.T. 1498-99.)  The scrapes and bruises on the breasts might have been produced by the squeeze of a hand. (6 R.T. 1499-1500.)

At their times of death, Harry's blood alcohol level was 0.04 (two drinks) and Avone's was 0.07 (three drinks). (6 R.T. 1535-36.)

A black briefcase, which did not belong to anyone in the Margulies family, was open on the kitchen floor.  It contained several rounds of .45 caliber ammunition and .32 caliber ammunition. (6 R.T. 1558-59; 7 R.T. 1869-70.) Harry Margulies' eyeglasses, which he always wore, and an open container of two-inch wide adhesive tape, were also in the kitchen. (7 R.T. 1661; 8 R.T. 1898-99.)

Avone Margulies' clothing and a kitchen potholder were on the floor of Bill Margulies' bedroom (8 R.T. 1884, 1890.)  A bicycle cable and lock, which did not belong to the Margulies, were on the bed in the master bedroom.  The cable had a drop of blood on it. (6 R.T. 1562; 8 R.T. 1884-85, 1997-98.)  A wine glass, apparently partially full of wine, was on the piano in the living room. (11 R.T. 2626.)

8

1    Bill Margulies testified that cardboard boxes in the master bedroom closet

2  that were formerly in a normal condition were crushed and covered in what

3  appeared to be blood. The closet had a rod for hanging clothes, and also contained

4  a safe. (6 R.T. 1570-77, 1665.) Neither the prosecutor nor defense counsel

5  questioned Bill Margulies any further about the bloody crushed boxes he claimed

6  he saw in the closet. The police detective who described the homicide scene never

7  mentioned the boxes, even though he described in great detail blood stains found

8  elsewhere in the house.[5]

9    Harry Margulies' handgun, a .45 caliber automatic pistol, was in its usual

10 place under his mattress in the master bedroom. It contained four live rounds of

11 ammunition. (8 R.T. 1886.)

12   The keys to the stereo store, which normally were kept on a buffet by the

13 front door, had been removed from the house. (6 R.T. 1595-96.) Nothing else

14 appeared to be missing, however.

15   **b.   Stereo store burglary**

16   A police officer responded to a call from the alarm company

17 reporting activation of a silent burglary alarm at Beverly Stereo at approximately

18 8:00 p.m. on the night of the murders. After investigating, however, he found no

19 signs of suspicious activity. (8 R.T. 1873-76.) The store alarm was again

20 triggered and reset several times after 11:00 p.m., indicating that someone was

21 probably walking around in the store. (8 R.T. 1974-76.)

22   At around 11:30 p.m., a couple passing by Beverly Stereo observed a car

23 driving slowly out of the alley behind the store, with a young black male walking

24 alongside the car holding several boxes that were resting on the hood. The couple

25 wrote down the license plate number of the car, and gave it to the police two days

26 later, on Monday, August 14, 1978. After determining that the car was registered

27

28 [5] Kimble alleges that the boxes "were not collected, sampled or even photographed by the police." (Pet'r Supp. Offer at 90:24-26.)

1   to Ortez Winfrey, the police obtained a search warrant for Winfrey's house. (10

2   R.T. 2465-70; 2547-50.)

3        Numerous items of stereo equipment from Beverly Stereo were found inside

4   the Winfrey residence. (10 R.T. 2551-83.) A smaller number of items were found

5   in Grant's and Kimble's residences. (10 R.T. 2583-85.) Out of a total of about 85

6   stolen items, four were found at Kimble's house. (10 R.T. 2563-64, 2585.) The

7   keys to the stereo store were also found in Kimble's house. (10 R.T. 2564.)

8                        c.    **Fingerprint evidence**

9        Fingerprint experts testified that 37 identifiable latent

10  fingerprints were lifted from the Margulies' house.[6] They were compared with

11  the fingerprints of Harry and Avone Margulies, Kimble, Grant, Ortez Winfrey, and

12  his brother Orthy Winfrey. (See 8 R.T. 2021; 9 R.T. 2137; 10 R.T. 2504-2505; 10

13  R.T. 2515; 10 R.T. 2539.) The experts concluded that of these 37 fingerprints,

14  three on the doorknob to a closet in the master bedroom, and two on a chair in the

15  den (where Avone Margulies was shot), were made by Kimble. (8 R.T. 2024-36.)

16  The experts testified they had no doubt about their conclusion that the prints were

17  Kimble's. (8 R.T. 2024, 2108; 9 R.T. 2138.) One fingerprint was made by Avone

18  Margulies. (8 R.T. 2036-38; 9 R.T. 2143.) The other fingerprints were not

19  identified.[7] None of the fingerprints lifted from the Margulies' residence were

20  positively matched to Grant or Winfrey. (10 R.T. 2523-24.)[8]

21       The police were unable to identify any of the 24 fingerprints lifted from the

22  stereo store. (8 R.T. 2038.)

23  _____

24  [6] An "identifiable" fingerprint is one containing sufficient ridge characteristics and clarity
    to allow a positive match with an exemplar. Not all identifiable fingerprints are actually
25  identified, if they are not compared to an appropriate exemplar. (See 8 R.T. 2041; 10 R.T.
    2533.)
26
    [7] An identifiable fingerprint was also found on the wine glass on the piano, but it could not
27  be matched. (10 R.T. 2532-33.)

28  [8] This does not mean that neither Winfrey nor Grant entered the Margulies' house. None
    of Harry Margulies' fingerprints were found in the house either. (10 R.T. 2524.))

1    Numerous fingerprints lifted from recovered stereo equipment bore Ortez

2    Winfrey's fingerprints.  (9 R.T. 2150-57.)  Fingerprints belonging to his brother

3    Orthy Winfrey were also on the stereo equipment.  (9 R.T. 2158; 10 R.T. 2538-39)

4    Two of Kimble's fingerprints were found on a turntable.  (9 R.T. 2159; see also 8

5    R.T. 2019, 2110 (identifying Kimble's prints).)[9]

6                    **d.    Ballistics evidence**

7                 The gun used in the crime was not found.  Various handguns

8    were mentioned during the trial, however, including the .45 caliber handgun that

9    Harry Margulies kept under his bed, the handgun in the Winfrey house (as

10   depicted in snapshots found in the Winfrey house portraying Orthy Winfrey with a

11   gun, a roll of cash, and a pile of real or imitation cocaine), and a .45 caliber

12   handgun that Ortez Winfrey claimed he saw in Kimble's possession.  (Ortez

13   Winfrey testified that the gun his brother was photographed with was actually

14   Kimble's.)  In his closing argument, the prosecutor asserted only that "a .45 was

15   available to Mr. Kimble and . . . he did use a .45 in the murder."  (13 R.T. 3180.)

16        In the search of Kimble's house, the police found two boxes of .45 caliber

17   bullets in one of the bedrooms.  (10 R.T. 2592; 11 R.T. 2621-22.)  A police

18   ballistics expert, however, testified that the bullets used to kill the Margulies had

19   been manufactured for military use and were very much unlike the bullets found in

20   Kimble's house.  Nor were the bullets that killed the Margulies like those found in

21   the black briefcase left in the Margulies' home.  The bullets had not been fired

22   from Harry Margulies' gun.  (10 R.T. 2407-12.)  The net effect of the ballistics

23   evidence was so unhelpful that the prosecutor referred to it only obliquely during

24   his closing argument, asserting that the fact that the bullets that killed the

25   Margulies were different from any of the ammunition found "doesn't disprove

26

27   [9] The presentation of the fingerprint identification evidence was extremely convoluted.  At
     one point, the prosecutor admitted that "my fingerprint evidence, at least, is in a complete
28   shambles at this point."  The trial judge replied, "You're correct in what you say.  I'm not
     being facetious."  (9 R.T. 2199.)

1    anything," and instead merely "shows they used a lot of different kinds of .45

2    ammunition." (13 R.T. 3178-80; see also 12 R.T. 3016 (ammunition found in

3    Kimble home designed to fit the same weapon as ammunition found in briefcase in

4    Margulies' home).)

5                    **e.    Bodily fluid evidence**

6                    All the blood found at the scene or recovered from Harry

7    Margulies, Avone Margulies, and Kimble was of Type A.  Kimble was a secretor,

8    meaning that his blood type can be determined from other bodily fluids, such as

9    saliva and semen.  The fluids recovered from Avone Margulies' vagina were also

10   of Type A. (Assuming the fluid samples are valid, this means only that a secretor

11   with blood type *other than A* did not ejaculate into her vagina, (8 R.T. 1994); it

12   says nothing about whether the semen came from Harry Margulies or Kimble.)

13   Other more specific tests (for enzymes ) existed at the time of the murders, but the

14   Los Angeles Police Department did not begin routinely performing those tests

15   until mid-1979, and did not actually perform those tests on the Margulies'

16   samples.  By the time of trial, it was too late to perform the tests. (8 R.T. 1988-

17   2006.)

18        Both Winfrey and Grant had Type O blood.  However, no evidence was

19   introduced as to whether Winfrey or Grant were secretors. (See 10 R.T. 2510-11

20   (testimony about Winfrey's blood type); 9 R.T. 2274-82 & Clerk's Tr. 242

21   (laboratory report reveals Grant's blood type).)

22                    **f.    Eyewitness testimony**

23                    At about 1:30 p.m. on the day of the murders, Ted Dietlin (the

24   Margulies' next-door neighbor) saw a young black man in a hooded blue

25   sweatshirt hiding in the bushes next to the Margulies' house.  When Mr. Dietlin

26   confronted the man, he said a couple of people were chasing him, and he was

27   hiding from them.  Mr. Dietlin saw no other people around, however.  The man

28   was carrying a black briefcase.  Mr. Dietlin asked him what was in the briefcase,

to which he replied that it was none of Dietlin's business.  He then asked Mr. Dietlin to give him a ride down the hill, but Mr. Dietlin refused.  The man then started walking down the hill.  Mr. Dietlin said he got a good look at the man's face, and at trial, identified Kimble.  He also identified the black briefcase recovered from the Margulies' house as the one the man had been carrying.  (7 R.T. 1780-87.)

At some point between 2:15 p.m. and 4:30 p.m., Mr. Dietlin, who was in his back yard, heard next door the sounds of a person swimming in the Margulies' pool, and the sounds of two people speaking in a normal tone of voice.  They sounded like the Margulies.  (7 R.T. 1788-89.)

Mr. Dietlin later told the police that he had seen a young black male in a blue sweat shirt, about six feet tall, about 170 pounds, and approximately 25 years of age.  (7 R.T. 1797; 8 R.T. 1920.)  This description closely matched Orthy Winfrey (Ortez Winfrey's older brother), who was 20 years old, 5'11" in height, and weighed 175 pounds.  (11 R.T. 2653-54.)

Mr. Dietlin was unable to identify Kimble initially in a set of photographs supplied by police officers shortly after the homicides, but he did identify Kimble as "similar" in a lineup about a month after the murders.  At trial, Mr. Dietlin explained that by "similar," he meant that he was not certain about the identification.  (7 R.T. 1804-1809.)

Mildred Shane lived about one-quarter mile down the street from the Margulies.  Between approximately 1:30 p.m. and 1:45 p.m. on August 12th, she saw a young black man running down Nightingale Drive "very, very fast."  (8 R.T. 2071.)  According to Ms. Shane, the young man was wearing a navy blue two-piece suit and was carrying a black briefcase.  At the bottom of the hill, the young man jumped over a low fence.  Ms. Shane saw the man for less than two minutes and, at his closest, he was approximately 15 to 20 feet away.  She estimated he was approximately 5'6" or 5'7" and in his early 20's.  She could not identify the

13

1   person by his face.  She testified that Kimble had the same hairstyle as the person
2   she saw and, after Kimble was asked to stand, that his physique "look[ed] about
3   the same" as the man who had been running down the street.  (8 R.T. 2073-74.)
4   Ms. Shane was unable to describe the hairstyle and was unfamiliar with the "Afro"
5   style, but in looking at a photograph of the lineup, she unequivocally stated that
6   the hairstyle of the man she saw was unlike Kimble's at the time of the lineup;
7   instead, it was similar to that of another individual in the lineup.  Ms. Shane
8   confirmed that she was able to discern the person's hairstyle because he was not
9   wearing a hooded garment.[10]  Shortly after the man ran by, Ms. Shane noticed a
10  small brown car coming down Doheny Drive.  Two black men were in it.  The car
11  "passed Nightingale Drive and stopped at the corner of the hillside for a moment
12  or two, and then it continued on around the hillside where I heard some brakes
13  screeching."  (8 R.T. 2075.)  Ms. Shane recalled that the car was about the size of
14  a small Volkswagen.  (8 R.T. 2069-89; see also 7 R.T. 1790-91, 1809 (Kimble was
15  No. 3 in lineup).)

16              g.    Ortez Winfrey's testimony

17              At trial, Ortez Winfrey testified to the following:  Around 6:00
18  p.m. on the evening of Saturday, August 12th, Kimble, who Winfrey had known
19  for several years, showed up at Winfrey's house.  Kimble told Winfrey he had the
20  keys to a stereo store, and invited Winfrey to accompany him to pick up some
21  stereo equipment.  Kimble said his boss, who owned the store, was out of town,
22  and had given Kimble permission to take the equipment.  Kimble told Winfrey that
23  he could have some of the equipment for himself too.  Winfrey agreed to help, and
24  drove Kimble to the stereo store.  (9 R.T. 2162 - 68.)

25              According to Winfrey, when they reached Beverly Stereo, Winfrey parked

26

27

28
_____

[10] Ms. Shane also said the man's hair looked like that depicted in Exhibit 46, which
Winfrey identified as Kimble with his "normal hairstyle."  Winfrey testified that Kimble's
hair was different at the lineup.  (8 R.T. 2088; 9 R.T. 2224.)

1   in front while Kimble got out and showed Winfrey that the keys opened the door
2   to the store. After Kimble relocked the doors, they went to a Taco Bell across the
3   street and ate supper. They returned to Winfrey's house for a while, and then
4   drove back to the stereo store. Winfrey parked his car in the alley behind the
5   stereo store. They placed some stereo equipment in the car and took it to
6   Winfrey's house, where Winfrey unloaded his share. Winfrey then drove to the
7   house of a neighbor of Kimble's, where Kimble unloaded the rest of the stereo
8   equipment. (9 R.T. 2168-82.)

9        Winfrey testified that the two men then returned to Winfrey's house. After a
10   short period, Kimble announced that he "had to go pick up some more equipment
11   for his boss." (9 R.T. 2182-83.) Winfrey asserted that at this time, he still
12   believed Kimble had permission to take the equipment. (9 R.T. 2183.) The two
13   men invited a neighbor of Kimble's, William Grant, to accompany them. With
14   Grant driving a separate car, the three men returned to the stereo store. They took
15   more stereo equipment from the store, loading it into both cars. It was around this
16   time, according to Winfrey, that he finally "realized that we'd been breaking into
17   the place." (9 R.T. 2184-90.) Grant then drove off with Kimble, and Winfrey
18   drove back to his own house. (9 R.T. 2193.) Winfrey testified that it was not until
19   several days later, when the police searched his house for the stolen equipment and
20   arrested him, that he learned that the owners of the stereo store had been killed. (9
21   R.T. 2237.)

22        Winfrey also testified that approximately seven or eight days before the
23   burglary, he had seen Kimble with a gun. He identified a .45 caliber automatic
24   pistol as similar to the one he saw Kimble with. (9 R.T. 2193-94.) The prosecutor
25   showed Winfrey a photograph, which Winfrey testified showed his brother Orthy
26   Winfrey with a .45 caliber handgun in the Winfrey house. Winfrey said the
27   photograph was taken "[a] couple of days" before the burglary, and that the gun
28   was Kimble's. He said Kimble had dropped the gun off at the Winfrey house and

1    left it there for "[a] couple of hours." (9 R.T. 2225-26.)[11]

2        On the subject of Kimble's hairstyle, Winfrey testified that a photograph of

3    Kimble accurately depicted Kimble's "normal hairstyle," although Winfrey could

4    not remember whether Kimble looked that way on the night of the burglary.

5    Winfrey testified that he had never seen Kimble with his hair in the style worn at

6    the lineup. (9 R.T. 2224.)

7        Winfrey also testified that he had "occasionally" seen Kimble with a

8    briefcase before the burglary. (9 R.T. 2227.) Winfrey testified a few minutes later

9    that Kimble had "frequently" carried a black briefcase similar to the one found in

10    the Margulies' house. (9 R.T. 2233.)

11        Winfrey testified that he had been charged with second degree burglary of

12    the Beverly Stereo store, but that the District Attorney's office had agreed to

13    dismiss the charge in exchange for his truthful testimony in the Kimble case. (9

14    R.T. 2237-38.)

15               **h.**      **Kimble's statement to police**

16        A tape recording of a police interrogation of Kimble after his

17    arrest was played for the jury. Asked where he obtained the stereo equipment

18    found in his house, Kimble said he had bought some of it three months earlier

19    from a man on the street. Other equipment he claimed to have purchased at a

20    police auction. Kimble said he did not know where the stereo shop keys came

21    from; they were not his. He denied killing anyone or committing a burglary, and

22    said he had never been in the Hollywood Hills. An officer told Kimble, "I got

23    your fingerprints all over a pad up there in the hills." Kimble said this was not

24

25

26

27

28

---

[11] Winfrey frequently used the term "a couple of" in describing the passage of time. It is unclear whether he used this phrase idiosyncratically, or for some reason was attempting to minimize the amount of time. For example, Winfrey initially stated that he had known Kimble for "about a couple of years," but later said he had known Kimble for "about nine or ten years." (9 R.T. 2163, 2224; see also 9 R.T. 2193-94 (testimony that he saw Kimble with a gun "[a] couple of days before the burglary," followed by testimony that he saw Kimble with a gun "[s]even or eight days" before the burglary.))

true.  The officer asked, "You want to bet your life we do?"  Kimble replied, "I bet my life."  When the officers told Kimble they had witnesses to the burglary, he asked to speak to a lawyer and the interview ended.  (10 R.T. 2599-2617.)

### 2.   Defense Case

The defense moved for a judgment of acquittal on the robbery and rape charges, and asked the court to strike all the special circumstance allegations. The court granted the motion with respect to the robbery of Avone Margulies, and denied it in all other respects.  (11 R.T. 2805-42.)

Most of the defense case was presented through cross-examination of prosecution witnesses and argument.  Testimony by defense witnesses itself consumed only about one-and-a-half court days.  (Clerk's Tr. 249-53; 11 R.T. 2845 - 12 R.T. 2996.)  Drawing attention to alleged inadequacies in the police investigation of the crimes and inconsistencies between different witnesses' accounts, defense counsel apparently sought to demonstrate that someone other than Kimble participated in the burglary and homicides at the Margulies' house.

### a.   Inadequacies in police investigation

The primary investigating officer admitted that Ortez and Orthy Winfrey had been his initial suspects in the store burglary and in the murders.  (11 R.T. 2654.)  He seized a blue hooded sweatshirt from the Winfrey residence, but subsequently gave it back to the Winfrey family.  (11 R.T. 2661-65.)  He searched Kimble's house for a blue sweatshirt, but found none.  (11 R.T. 2696.)  A pair of leather gloves was found in Ortez Winfrey's car; these too were returned to Winfrey family.  (11 R.T. 2677.)  A lady's purse (containing identification) was found in Ortez Winfrey's bedroom, but police records did not report it as having been stolen.  For some reason, the police did not contact the owner of the purse. (11 R.T. 2678-80.)

A housekeeper worked and lived in the Margulies' house during the week and on Saturday mornings.  Although she had reported seeing prowlers outside the

1   house on several occasions, the police never interviewed her.  (7 R.T. 1753-54; 11

2   R.T. 2705-2706.)

3         Defense counsel elicited testimony from the Margulies' children that in the

4   months before the murders, several suspicious incidents occurred at the Margulies'

5   house.  There were apparently two attempted break-ins.  In the first incident, a

6   screen was removed from a window.  This prompted Mr. Margulies to borrow a

7   .45 caliber automatic pistol from a friend, which he kept under the mattress in his

8   bedroom.  In the second incident, Bill Margulies and his girlfriend arrived home to

9   find a young black man standing in the house.  No one else was home.  The man

10  initially led Bill to believe he had permission to be in the house.  Bill eventually

11  began to doubt the man's story, however, and went to get the gun from his father's

12  room.  The man then fled into the street.  Bill chased after him and fired the gun

13  into the air.  After this incident, the Margulies installed an alarm system in their

14  house.  (6 R.T. 1564-69, 1593-94; 7 R.T. 1617-23, 1749-52; 11 R.T. 2705.)

15              **b.    Problems with lineup**

16              On cross-examination of the primary investigating officer,

17  defense counsel focused on the lineup in which Kimble appeared along with five

18  other black males.  The lineup was attended by both of the Margulies children,

19  their neighbor Ted Dietlin, and Bill Margulies' girlfriend, who was present when

20  the intruder was found in the Margulies' house.  Neither William Grant nor any of

21  the Winfrey brothers were included in any lineups.  Bill Margulies' girlfriend

22  thought one of the other participants resembled the intruder, but she was unsure.

23  Another participant looked familiar to Bill Margulies, but he was unable to say

24  from where.  These other participants were not interviewed by investigating

25  officers.  (11 R.T. 2642-50.)

26              **c.    Cross-Examination of Ortez Winfrey**

27              Cross-examining Ortez Winfrey, defense counsel drew

28  attention to certain inconsistencies between his testimony in court and his prior

18

statement to the police, such as when Kimble first appeared at Winfrey's house with the keys, how many times the two men visited the stereo store, whether Winfrey went into the store with Kimble on the first visit, and when Winfrey first realized that he was stealing the stereo equipment. (9 R.T. 2291-2300, 2330-34.) Defense counsel also elicited Winfrey's description of himself and his three brothers who lived with him, in an apparent attempt to establish that Winfrey or one of his brothers fit the description given by the Margulies' neighbor, Ted Dietlin. (9 R.T. 2257-58, 2285-87.) Winfrey admitted that certain photographs taken a few days before the burglary showed his brother Orthy Winfrey at home with a .45 caliber handgun, a pile of money, and a mound of white powder on a record album. Winfrey testified the money belonged to his brother and the powder was "baby powder or baking soda." (9 R.T. 2301-11.)

Mr. Walton attempted to elicit Winfrey's admission that before he gave the police a description of the briefcase he claimed Kimble frequently carried, the police had showed Winfrey the briefcase found in the Margulies' residence. (9 R.T. 2311-12, 2321-30.) Although Winfrey's testimony on this subject was confusing, he ultimately claimed his initial description and drawing of the briefcase was based on memory, not on what the officers showed him. (9 R.T. 2378.)

Winfrey admitted he had taken a large number of pieces of stereo equipment and placed them in various locations around his house, and that he, not Kimble, kept the two most expensive pieces of equipment. (9 R.T. 2338-39.)

Winfrey admitted that he possessed a hooded blue sweatshirt. (9 R.T. 2359-61.) (Ted Dietlin had testified that the man he observed in the bushes near the Margulies' house was wearing such a sweatshirt.)

Defense counsel also elicited contradictory statements from Winfrey about whether he had graduated from high school. He established that while in high school, Winfrey was involved in an incident involving the theft of tape recorders,

19

1  and was expelled.  (9 R.T. 2255, 2362-67.)

2                **d.    Testimony of Kimble family and acquaintances**

3                Kimble's father, mother, sister, and brother, and three of

4  Kimble's friends, all testified that Kimble did not own or drive a car, and instead

5  was given rides by friends, including by Ortez Winfrey and William Grant, when

6  he needed to travel.  (11 R.T. 2869; 12 R.T. 2892, 2912, 2928, 2937-38, 2963-64.)

7  They also testified that Kimble did not have a briefcase.  Kimble's father testified

8  that the .45 caliber bullets found in his home were his own and had been there

9  since 1967.  (11 R.T. 2867.)[12]  Kimble's mother testified that she was at home on

10  the day of the homicides until approximately 12:15 p.m., and that Kimble was

11  home all morning.  (12 R.T. 2894.)  In the week before the murders, she testified,

12  Ortez Winfrey frequently came by to see Kimble, more than usual.  (12 R.T.

13  2896.)  Kimble's sister testified that she was also at home all day that Saturday,

14  and that Ortez Winfrey came by between 1:00 p.m. and 2:00 p.m. to see Kimble.

15  Kimble was with Winfrey and William Grant, in the vicinity of the Kimble house,

16  throughout the entire afternoon.  The three men played music in the Kimble house

17  from about 3:00 p.m. until about 5:30 p.m.  (12 R.T. 2908-12.)

18                Two of Kimble's friends testified that they had observed Winfrey carrying a

19  black briefcase around the time of the murders.  (12 R.T. 2938-39, 2965.)  A

20  friend also testified that he had seen Ortez Winfrey in his car with a black

21  briefcase and a handgun several days before Kimble's arrest.  (12 R.T. 2965-66.)

22                The defense sought to cast suspicion on Winfrey by presenting evidence

23  that the Winfreys owned a beige Oldsmobile.  (11 R.T. 2851-53.)  (The Margulies'

24  neighbor Mildred Shane had seen a small brown car with two black men driving

25  fast around 1:00 p.m. on the day of the murders.)  The defense also presented the

26

27

---

28  [12] In rebuttal, the prosecution presented evidence that of the two boxes of ammunition found in Mr. Kimble's room, one box contained bullets manufactured before 1960, and the other contained bullets manufactured in 1974.  (12 R.T. 2976-77.)

20

1   testimony of the owner of the woman's purse found in Winfrey's room, who stated

2   that a young black male, whom she could not identify, had snatched the purse from

3   her in a supermarket parking lot in May 1978.  (12 R.T. 2982-87.)

### 3.   Closing Arguments

#### a.   Prosecution closing argument

6         The prosecutor argued that Kimble had acted alone in

7   burglarizing the Margulies' home and shooting the Margulies.  (12 R.T. 3002,

8   3034-36.)  Kimble must have somehow known about the Margulies' home and

9   business, the prosecutor contended, and must have "had some reason to gravely

10  dislike the Margulies people, whatever it may be."  (12 R.T. 3003.)  He suggested

11  that perhaps Kimble's "feelings were hurt while he was shopping or playing with

12  the equipment" on some prior occasion in the stereo store, and that he was

13  animated by a desire to exact "sadistic revenge" on the Margulies.  (12 R.T. 3004.)

14        Because Kimble was operating alone, the prosecutor argued, he needed to

15  quickly immobilize "the man of the house" with the handcuffs and the adhesive

16  tape.  Kimble probably used the bicycle cable and lock to tether Harry Margulies

17  to a part of his bed, or to the hanger rod in his bedroom closet, the prosecutor

18  suggested, in order "to get Mr. Margulies out of action while he raped Mrs.

19  Margulies."  The prosecutor contended that Kimble must have wanted Harry

20  Margulies to hear his wife being raped.  (12 R.T. 3034-35, 3056.)  He argued that

21  the evidence proved beyond a reasonable doubt that Avone Margulies had been

22  raped, even though laboratory analysis of the seminal fluid found in her vagina did

23  not rule out her husband as the source.[13]  In view of the Margulies' ages (Avone

24  was 51 and Harry was 61), the prosecutor reasoned, if the Margulies had wanted to

25  have sex, they would probably have "use[d] the nice bed in their bedroom," and

26

27

28

---

[13] The prosecutor also argued that Ortez Winfrey "couldn't be the rapist" because he has
type O blood.  (13 R.T. 3167.)  Since it was never established that Winfrey was a secretor,
however, the evidence did not in fact rule out Winfrey as the source of the seminal fluid.

21

1    would "have their sex in a dignified manner . . . ." Instead, Avone Margulies'

2    clothes were on the floor of her son's bedroom. The prosecutor also argued that

3    Harry Margulies would not have caused the minor bruises and abrasions on his

4    wife's breasts. (12 R.T. 3012-13.)

5         The prosecutor theorized that after Avone Margulies was shot in the den,

6    she was able to move to the front hall and turn the key to activate the alarm. The

7    sound of the alarm probably caused Kimble to rush out, leaving the briefcase and

8    bicycle cable behind. (12 R.T. 3065.)

9                   **b.    Defense closing argument**

10            In his closing argument, defense counsel accused the

11   prosecution of engaging in "outrageous speculation" about Kimble's motives and

12   about what occurred inside the Margulies' house. He observed that there was no

13   evidence that Kimble had ever been in the stereo store before the night in question,

14   or that Kimble knew the Margulies family. (12 R.T. 3076-78.) The defense

15   emphasized four themes: inadequacies in the police investigation of the crimes,

16   Ortez Winfrey's lack of credibility, the inability of eyewitnesses to readily identify

17   Kimble, and the reasonable doubt standard.

18        The defense challenged the prosecution's hypothesis that the events at the

19   Margulies' residence had been perpetrated only by a single individual and not by a

20   group of people acting in concert. The defense noted that the evidence was

21   virtually uncontroverted that Kimble lived far away from the Margulies' residence,

22   did not have a car, did not drive, and had no other personal means of

23   transportation, but relied entirely on friends to get around. (12 R.T. 3083-84.)[14]

24   The defense also highlighted the physical evidence, which seemed inconsistent

25

26

27

28   [14] Defense counsel argued that the prosecutor needed to portray Kimble as acting alone to prove the truth of the special circumstance allegations that the murders were "personally committed or physically aided by the defendant." (12 R.T. 3104-3106.)

22

1   with the lone intruder hypothesis.[15]  (12 R.T. 3107-17.)  The expressed purpose of

2   this argument was to suggest that Kimble could not have committed the murders;

3   the ultimate effect, however, was simply to posit that Kimble probably did not act

4   alone.

5          Defense counsel reminded the jurors of the tenuous nature of the

6   circumstantial evidence put forward by the prosecutor, and of their duty to adopt a

7   reasonable alternative explanation if it pointed to Kimble's innocence.  It was

8   more likely that the Margulies had had sex earlier in the afternoon than that Avone

9   Margulies had been raped.  It was the first time in a week that they had been home

10  alone together, and they had been drinking and swimming.  None of the beds were

11  rumpled, Avone Margulies' clothes were not ripped, and there was no evidence of

12  trauma to her vagina.  Mr. Margulies' blood type was A, so he could have been the

13  source of the seminal fluid.  Finally, if there had been a rape, it would have had to

14  occur within a very brief period of time.  (12 R.T. 3121-25.)

15         A significant portion of the defense was aimed at attacking Ortez Winfrey.

16  First, counsel complained of the shortcomings in the police investigation,

17  especially as it pertained to Winfrey as a possible suspect.  The defense observed

18  that police failed to interview the Margulies' housekeeper, who had been at the

19  house until approximately noon on the day of the killings, and failed to interview a

20  third witness from the neighborhood who had reported seeing a young African-

21  American man in the vicinity on the day of the homicide.  (12 R.T. 3082-85.)  The

22  defense criticized the police for returning to Winfrey a blue hooded sweatshirt

23  seized from his house and failing to seek Mr. Dietlin's opinion as to whether the

24  garment matched the items worn by the young man that Mr. Dietlin spoke to on

25

26  ────────────

27  [15] In addition to the numerous different kinds of ammunition, which defense counsel
    argued showed the likelihood of more than one weapon in the house, defense counsel
    claimed that it would have been impossible for Kimble, a teenager of slight build, acting

28  alone, to subdue both of the Margulies simultaneously and to bound and gag the strong and
    healthy Harry Margulies while holding a gun or otherwise controlling Avone Margulies.

1   the afternoon of August 12, 1978. (12 R.T. 3085.) The defense noted that the

2   homicide investigator's report stated that Winfrey denied any involvement in the

3   homicides when, in fact, the transcript revealed that no such question was ever

4   asked of Winfrey. Defense counsel also emphasized the fact that the police never

5   showed the eyewitnesses pictures of Ortez Winfrey or his brother Orthy, and never

6   placed the Winfrey brothers in a lineup. (12 R.T. 3086.)

7        The defense also focused on the evidence suggesting that Winfrey was

8   involved in the homicides. Defense counsel started by emphasizing Winfrey's

9   role as an accomplice in the stereo store burglary. His accomplice status

10  precluded the jury from accepting his testimony unless it was corroborated, and

11  provided him with an inherent bias to shift the criminal blame to others. (12 R.T.

12  3093.) Defense counsel reminded the jurors that Winfrey was promised a

13  dismissal of the burglary charges in exchange for his testimony against Kimble.

14  (12 R.T. 3093-94.) Defense counsel also stressed that Winfrey was the prime

15  beneficiary of the stereo store burglary: Winfrey took home more than half the

16  major stereo components and, in terms of retail value, obtained nearly 80% of the

17  proceeds. As defense counsel observed, Winfrey had procured more items than he

18  could use; even after having opened several of the component packages, Winfrey

19  still had so many excess items that he had to store the items in closets around the

20  house. Defense counsel also commented that Winfrey not only kept the most

21  expensive of the stereo components — a cassette deck worth $1,900 — but this

22  single item was more expensive than the total value of all the items obtained by

23  Grant and Kimble combined. (12 R.T. 3099-3102.)

24       The defense reminded the jurors that Winfrey owned dark hooded

25  sweatshirts similar to the one described by witness Mr. Dietlin, matched the height

26  and weight descriptions given by Mr. Dietlin, and Winfrey was familiar with guns,

27  as demonstrated by the picture of his brother with a handgun sitting in the

28  background and by his testimony identifying the size and manufacturer of different

1   guns.  Defense counsel also observed that police had found black leather gloves in
2   Winfrey's car, enabling him to avoid leaving fingerprints.  Finally, defense
3   counsel highlighted many of the inconsistencies between Winfrey's trial testimony
4   and the version of events he gave the police, as well as other incontrovertible
5   evidence.  (12 R.T. 3088-98, 3131-32.)

6        As for the eyewitness identifications, defense counsel focused on the
7   similarities between Ortez Winfrey and Mr. Dietlin's description of the man he
8   saw.  Defense counsel also emphasized that Mr. Dietlin's first positive
9   identification of Kimble came at the trial despite two prior confrontations.  At the
10  first, Mr. Dietlin was presented with a photo spread from which he was unable to
11  identify Kimble. At the second (the lineup), Mr. Dietlin concluded only that
12  Kimble was "similar" to the person he saw outside the Margulies' house.  Defense
13  counsel also argued that the eyewitness identifications were of doubtful reliability
14  in light of the significant variations between Mr. Dietlin's and Ms. Shane's
15  descriptions of the man they saw.  Defense counsel again noted the police's failure
16  to attempt to locate a third eyewitness who might have been able to resolve these
17  discrepancies.  (12 R.T. 3084-85, 3127-33, 3141.)

18       Addressing the fingerprint evidence, defense counsel noted that the
19  exemplars from which the experts worked had been taken during the trial and
20  suggested that the delay in securing a firm identification rendered the comparison
21  unreliable.  Defense counsel also pointed out that the identifications had been
22  performed in court by the naked eye and without the aid of a magnifying glass or
23  other tools.  (12 R.T. 3133-35.)

24       **4.   Verdict**

25       After deliberating for about two-and-a-half court days, the jury
26  delivered its verdict on Monday, December 22, 1980.  (Clerk's Tr. 255-257, 351.)
27  Kimble was found guilty on all counts:  the burglaries of the Margulies' residence
28  and the stereo store, the robbery of Harry Margulies, the rape of Avone Margulies,

1  and the murders of Harry and Avone Margulies.  The jury also found true special
2  allegations that Kimble personally used a firearm during the commission of the
3  offenses at the Margulies' residence. (Clerk's Tr. 351-353A.)

4       The jury found each of the five special circumstance allegations to be true.[16]
5  These included findings that each of the murders was "willful, deliberate and
6  premeditated, and . . . personally committed or physically aided by the defendant
7  during the commission and attempted commission of a robbery . . . ," and that the
8  murder of Avone Margulies was "personally committed or physically aided by the
9  defendant during the commission and attempted commission of rape . . . ."
10  (Clerk's Tr. 351, 352.)  Under California law, these findings required Kimble to be
11  sentenced either to death or to life imprisonment without possibility of parole.
12  Accordingly, the trial proceeded to a penalty phase for consideration of evidence
13  in aggravation and mitigation.

14       **G.    Penalty Phase**
15       The penalty phase was brief.  It began on Tuesday, January 6, 1981, and
16  including closing arguments and jury instructions, consumed slightly more than
17  two court days.  The jury then deliberated for three court days (separated by a
18  weekend break), and returned a verdict on Monday, January 12, 1981. (13 R.T.
19  3260-3411; Clerk's Tr. 354-77.)

20       The prosecutor introduced no additional evidence at the penalty phase,
21  relying instead entirely on the evidence that had been presented earlier at the guilt
22  phase. (13 R.T. 3264-65.)

23       The defense presented six witnesses (Kimble's parents, sister, and three
24  neighbors), who testified that Kimble was well liked in the neighborhood, was
25  kind to children and to the elderly, and in the opinion of his parents, was incapable
26  of killing two people. (13 R.T. 3290-3333, 3302, 3313.)  Their testimony fills 37
27

28  _____
   [16] The two burglary special circumstance allegations had earlier been struck at the request
   of the prosecution. (See Clerk's Tr. 252; 12 R.T. 2955, 2984-86.)

26

1    pages of the transcript, and appears to have consumed less than two hours.  (See

2    13 R.T. 3266-3333; Clerk's Tr. 354-56.)  The defense also introduced two

3    photographs depicting Kimble as a boy around the age of ten.  (13 R.T. 3317-18,

4    3339.)

5        Outside the presence of the jury, defense counsel then made the following

6    statement:

7            The court knows of the rather agonizing equivocations to
         which I have gone the last couple of days on the question
8        whether to put the defendant on the stand in this phase of the
         trial.
9

10           I'm now asking through the Court whether the district
         attorney has any intention presently of introducing rebuttal
11       evidence.  I have noticed first the presence of Investigator
         Duran in other activities, which causes me to wonder whether
         he has in mind some evidence which he proposes to introduce
12       only in the event Kimble testifies.

13   (13 R.T. 3334-35.)  Defense counsel conceded that the statute explicitly exempted

14   rebuttal evidence from the requirement that the prosecutor give advance notice of

15   evidence in aggravation, but urged the Court nonetheless to require notice in "the

16   spirit of the [statute]."  (13 R.T. 3335.)  The trial court refused to order the

17   prosecutor to give notice, but he did ask him whether he would respond to the

18   defense's request.  The prosecutor stated:

19           I have Investigator Duran here for two purposes.  One is
20       to carry out any further investigation or leads that might be
         developed by the defendant's testimony.  And, secondly, to
21       investigate some possible witnesses as to acts of force and
         violence that I was not aware of until [approximately one hour
22       ago].
                 . . .
23
             Whether this will mean witnesses or not, I probably
24       won't know until tomorrow.

25   (13 R.T. 3335.)  Upon hearing this, the defense rested.

26       In his closing argument, the prosecutor conceded that the defense had

27   shown that Kimble "was a pretty nice boy around the home . . . ."  However, just

28   as a lion or tiger seems harmless when it is nursing its young or lying in a cage at

27

1   the zoo, but is in fact a ruthless killer when it "is hungry and wants something,"

2   the prosecutor urged the jury to judge Kimble not by his behavior when he was

3   with family and friends, or by his behavior "in the courtroom, which you might

4   analogize to a cage, because you know it will avail him nothing to be violent

5   here," but instead to judge Kimble based on what he did to the Margulies. (13

6   R.T. 3340-41.) The prosecutor focused on the manner in which the Margulies had

7   been bound, gagged, and murdered in their house, and emphasized that Kimble's

8   participation was substantial; indeed, he claimed, Kimble was "the actor." (13

9   R.T. 3343-46, 3351.)

10      The prosecutor argued that "as you consider aggravation and mitigation the

11   stark thing before you is there is no mitigation." (13 R.T. 3352.) None of the

12   statutorily prescribed mitigating factors, he contended, favored life imprisonment

13   over death. Noting that "the age of the defendant at the time of the crime" is one

14   such factor, and that Kimble had been 18 years old, he argued that Kimble's

15   criminal acts nevertheless demonstrated that Kimble was not immature. Instead, it

16   was fortunate for society that Kimble had been caught so early in life since, unlike

17   a ship, a person is not given a "shakedown cruise" during which potential

18   problems may be discovered before he is introduced into society. "Mr. Kimble's

19   shakedown came when he was 18 years old, and he has proven by the evidence, by

20   his own conduct, not only that he is not fit for society, but also I think you will

21   agree that he is not fit to be here." (13 R.T. 3348-51.)

22      Defense counsel responded by delivering a generic attack on the death

23   penalty, despite the fact that all the jurors had sworn during voir dire that they

24   could vote to impose the death penalty in a proper case. He asked the jurors not to

25   "demean and degrade and dehumanize yourselves by killing Eric Kimble," and

26   urged them to spare his life for the sake of his parents. (13 R.T. 3355-56.) He did

27   not point to any mitigating evidence. Instead, he argued that the death penalty is

28   barbaric and unnecessary, is imposed capriciously, and does not deter crime. (13

28

1  R.T. 3357-66, 3374-76.)

2         The jury deliberations took longer than the in-court portion of the penalty

3  phase proceedings.  The jurors deliberated for more than 11 hours, spread over

4  three court days separated by a weekend break.  After nearly five hours of

5  deliberations, on Thursday, January 8, 1981, at 3:25 p.m., the jury sent the

6  following note to the judge:

7
            If the jury feels the possibility at this time that we will not be
8            able to find a unanimous decision, what will then be the court's
             decision[?]
9

10  (Clerk's Tr. 356, 376; see also 13 R.T. 3390.[17])  The judge read this note in

11  chambers and instructed the bailiff to tell the jury to continue deliberating.

12  (Clerk's Tr. 356.)  The jurors continued deliberating for about another half hour,

13  then recessed for the day.  (Clerk's Tr. 356; 13 R.T. 3388-C.)

14         The jurors resumed their deliberations at 9:45 a.m. the next morning, Friday,

15  January 9, 1981.  At 11:20 a.m., they sent a second note to the judge:

16
            According to our printed instructions, special
17          circumstances found to be true in Counts I and II of the
            information fix the penalty as either life imprisonment without
18          the possibility of parole or death.  Is there any further criteria
            that can be used to determine one penalty as opposed to the
19          other or is it simply the matter of our personal choice?

20  (Clerk's Tr. 357, 375, see also 13 R.T. 3390-94.)  The judge read this note in

21  chambers, and then at 12:10 p.m. released the jurors for lunch, telling them that

22  their question would be answered after lunch.  (Clerk's Tr. 357; 13 R.T. 3389.)

23         After consulting with the prosecutor and defense counsel, the trial court

24

25
    _____

26  [17] Portions of the Reporter's Transcript for Friday, January 9, 1981, appear to be
    erroneously dated January 8, 1981.  (See 13 R.T. 3389, 3390.)  The content of those
27  portions of the Reporter's Transcript are consistent with the Clerk's Transcript for January
    9, 1981.  (See Clerk's Tr. 357.)  The Court concludes that the Clerk's Transcript more
28  accurately reflects the dates and times of the jury notes and the trial court's responses
    thereto, and the date heading in the Reporter's Transcript is a typographical error.

responded to the jurors' questions.[18]  In response to their inquiry about what would happen if they could not reach a unanimous decision, he told them simply, "That is not within your province." (13 R.T. 3393.)  In response to their second question, he explained:

> It is not a matter of your personal choice.  At the time that you were sworn you were sworn to follow the law as I read it to you.  This takes it out of the province of it being your personal choice.
>
> You are to follow the law, regardless of what your personal choice may be.
>
> I again will emphasize that there is no further criteria other than the instructions that have previously been given you, and I will read the instructions again to you.

(13 R.T. 3394.)  The judge then reread the entire penalty phase instructions exactly as he had initially. (13 R.T. 3395-99; cf. 13 R.T. 3383-87.)  He concluded with the following additional remark:

> Ladies and gentlemen of the jury, I read the guidelines that are set forth by law.  You are to use those guidelines and reach your decision.  There is no further criteria that I can give you, and you are not to simply make it a matter of your personal choice.  The choice must be according to the law that I have given you.  Regardless of what your personal choice in any given situation might be, that's not your duty.  Your duty is not to follow your personal choice, but you are to follow what the law states that you must do, and that is what I have read to you in your instructions.  Thank you.  You may retire.

(13 R.T. 3400-3401.)  The jurors then resumed their deliberations for another two hours before breaking for the weekend. (Clerk's Tr. 357; 13 R.T. 3404.)

On Monday, January 12, 1981, the jurors deliberated for two more hours,

---

[18] The judge told counsel he intended to instruct the jurors not to consider what would happen if they were unable to reach a unanimous decision, and that their decision as to the appropriate punishment "is not a matter of their personal choice . . . ."  The prosecutor approved of these responses.  Defense counsel objected, and urged the court to discharge the jury.  He argued that the notes indicated the jurors understood the amorphous nature of their penalty-phase instructions and had concluded that the instructions provided insufficient guidance for them to reach a decision, so that they were, in effect, being asked to make a completely arbitrary choice. (13 R.T. 3390-92.)

1    and at noon announced they had reached a verdict.  For each of the two separate

2    murder counts, they chose death.  (Clerk's Tr. 377; 13 R.T. 3405-3409.)

3         On April 1, 1981, the trial court denied Kimble's automatic motion for

4    modification of the verdict and sentenced Kimble to death.  (Clerk's Tr. 382-84.)

5         On automatic direct appeal, the California Supreme Court affirmed the

6    judgment in its entirety, with two justices dissenting as to penalty.  People v.

7    Kimble, 44 Cal. 3d 480, 244 Cal. Rptr. 148, 749 P.2d 803, cert. denied, 488 U.S.

8    871 (1988).

9    **II.    Legal Standard for Holding Evidentiary Hearing**

10        "A habeas petitioner is entitled to an evidentiary hearing as a matter of right

11   on a claim where the facts are disputed if two conditions are met:  (1) the

12   petitioner's allegations would, if proved, entitle him to relief; and (2) the state

13   court trier of fact has not, after a full and fair hearing, reliably found the relevant

14   facts."  Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir. 1997); Townsend v. Sain,

15   372 U.S. 293, 310-19 (1963), overruled in part on other grounds, Keeney v.

16   Tamayo-Reyes, 504 U.S. 1 (1992).  "However, an evidentiary hearing is *not*

17   required on issues that can be resolved by reference to the state court record."

18   Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998) (emphasis original);

19   Hendricks v. Vasquez, 974 F.2d 1099, 1103 (9th Cir. 1992) ("Hendricks I") (no

20   hearing required where "there are no disputed facts and the claim presents a purely

21   legal question.").

22        Although Kimble requested a hearing in state court on his habeas claims,

23   the state courts did not hold a hearing.  Thus, this is a case in which "the state

24   court trier of fact has not . . . reliably found the relevant facts."  Jones, 114 F.3d at

25   1010.  Accordingly, in deciding whether to hold an evidentiary hearing on each of

26   Kimble's claims, the question is whether Kimble would be entitled to relief on the

27   basis of the claim, if he could establish the truth of his allegations.  See id. at

28   1010-11; Babbitt v. Calderon, 151 F.3d 1170, 1177 (9th Cir. 1998).

1   "An evidentiary hearing is not required on allegations that are 'conclusory
2   and wholly devoid of specifics.'" Campbell v. Wood, 18 F.3d 662, 679 (9th Cir.
3   1994) (quoting Boehme v. Maxwell, 423 F.2d 1056, 1058 (9th Cir. 1970)) (en
4   banc); accord James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994). To obtain an
5   evidentiary hearing, therefore, Kimble must point to specific facts in support of his
6   allegations of constitutional error. See Jones v. Gomez, 66 F.3d 199, 204-205 (9th
7   Cir. 1995); cf. Blackledge v. Allison, 431 U.S. 63, 75 n.7 (1977) ("[T]he petition
8   is expected to state facts that point to a real possibility of constitutional error.")
9   (citation and internal quotation marks omitted).

10   **III.   Legal Standard for Ineffective Assistance of Counsel Claims**

11   "To prevail on a claim of ineffective assistance of counsel, a petitioner must
12   show that: (1) 'counsel's performance was deficient;' and (2) 'the deficient
13   performance prejudiced the defense.'" Visciotti v. Woodford, 288 F.3d 1097, 1105
14   (9th Cir. 2002) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).

15   To establish deficient performance, Kimble must demonstrate that defense
16   counsel "failed to exercise the skill, judgment, or diligence of a reasonably
17   competent attorney . . . ." United States v. Vaccaro, 816 F.2d 443, 455 (9th Cir.
18   1987); Strickland, 466 U.S. at 687-88. "Judicial scrutiny of counsel's performance
19   must be highly deferential," and the court must avoid second-guessing decisions
20   of trial counsel that, at the time they were made, were the product of sound trial
21   strategy. Strickland, 466 U.S. at 689; Campbell, 18 F.3d at 673. Although the
22   court "must indulge a strong presumption that counsel's conduct falls within the
23   wide range of reasonable professional assistance," it may be necessary to hold an
24   evidentiary hearing to determine the reasons for counsel's actions if those actions
25   do not appear to have been the product of reasonable strategic decisions reached
26   after an adequate investigation of all the relevant facts. Strickland, 466 U.S. at
27   689; Siripongs v. Calderon, 35 F.3d 1308, 1314-15 (9th Cir. 1994); Hendricks I,
28   974 F.2d at 1110.

32

1        Because the purpose of the Sixth Amendment guarantee is to ensure that the

2    trial is fair, not every error by defense counsel warrants setting aside the verdict.

3    Strickland, 466 U.S. at 691-92.  If an attorney's mistake did not materially affect

4    the trial, then the defendant was not deprived of the effective assistance of

5    counsel.  See id. at 691-94.  To prove that a trial was unfair within the meaning of

6    the Sixth Amendment, therefore, a defendant must show more than just "that the

7    errors had some conceivable effect on the outcome of the proceedings."  Id. at 693.

8    "On the other hand, . . . a defendant need not show that counsel's deficient

9    conduct more likely than not altered the outcome in the case."  Id.  "The result of a

10    proceeding can be rendered unreliable, and hence the proceeding itself unfair,

11    even if the errors of counsel cannot be shown by a preponderance of the evidence

12    to have determined the outcome."  Id. at 694.  Employing the same test that is used

13    to assess the materiality of exculpatory evidence not disclosed to the defense by

14    the prosecution, the Supreme Court has held that a defendant is prejudiced by an

15    attorney's deficient performance if "there is a reasonable probability that, but for

16    counsel's unprofessional errors, the result of the proceeding would have been

17    different."  Id.; see Kyles v. Whitley, 514 U.S. 419, 433-34 (1995).  As with Brady

18    errors, the Court has explained that "a reasonable probability is a probability

19    sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694;

20    Kyles, 514 U.S. at 434.

21        In evaluating a claim of ineffective assistance of counsel at the guilt phase

22    of a trial, "the question is whether there is a reasonable probability that, absent the

23    errors, the factfinder would have had a reasonable doubt respecting guilt."

24    Strickland, 466 U.S. at 695.  In evaluating a claim of ineffectiveness at the penalty

25    phase, "the question is whether there is a reasonable probability that, absent the

26    errors, the sentencer . . . would have concluded that the balance of aggravating and

27    mitigating circumstances did not warrant death."  Id.; Clabourne v. Lewis, 64 F.3d

28    1373, 1378 (9th Cir. 1995).  Where the claim is that defense counsel failed to

1   investigate or present certain evidence in mitigation, "in order to determine

2   whether [defense counsel's actions] . . . might have affected the jury's decision, it

3   is essential to compare the evidence that actually was presented to the jury with

4   the evidence that might have been presented had counsel acted differently." <u>Bonin</u>

5   <u>v. Calderon</u>, 59 F.3d 815, 834 (9th Cir. 1995).

6   **IV.   Mental Health Claims**

7        Claims 1-5 of the petition allege that as a result of mental impairments,

8   Kimble was incapable of premeditation and deliberation, incapable of validly

9   waiving his privilege against self-incrimination, and incompetent to stand trial.

10   Related to these allegations, Claim 10(E) asserts defense counsel was ineffective

11   because he failed to investigate and present evidence of Kimble's mental

12   impairments, either at the guilt phase as a defense to the murder charges, or at the

13   penalty phase as evidence in mitigation.

14        **A.   Claim 10(E):   Ineffective Assistance of Counsel**

15            **1.   Ineffectiveness at Penalty Phase**

16        As the brief penalty phase transcript reveals, no evidence relating to

17   Kimble's mental health was presented to the jury.  Kimble claims his mental

18   problems were apparent, and that substantial evidence was readily available, had

19   counsel only looked.  He alleges that the Public Defender's office, in the course of

20   representing him in a juvenile proceeding several months earlier, obtained

21   Kimble's school records and probation reports, which were replete with references

22   to his psychological problems, learning disorders, and drug abuse.  The attorneys

23   who represented Kimble for his murder trial, however, neglected to contact the

24   Public Defender's office, and failed to obtain these records.

25        Kimble contends that in requesting investigative funds from the trial court,

26   his first attorney, Mr. Grumman, represented that a psychiatrist was needed to

27   assist the defense.  But neither Mr. Grumman not replacement counsel, Mr.

28   Walton, ever consulted a mental health expert.

1    Kimble claims Mr. Grumman did almost nothing to investigate his case.
2    During the sixteen months that Mr. Walton represented Kimble prior to trial, he
3    allegedly spent just twenty hours investigating both guilt and penalty issues.
4    Kimble claims Mr. Walton conducted no independent investigation, instead opting
5    to interview only some witnesses supplied by Kimble's family.

6    Kimble's allegations are only allegations at this stage, but if proven, they
7    would establish constitutionally deficient performance at the penalty phase.  In
8    several recent habeas corpus cases arising out of capital trials that occurred in
9    1980's, the United States Supreme Court and the Court of Appeals for the Ninth
10   Circuit have held that defense counsel had a duty to conduct a thorough
11   investigation into the defendant's character and background in a search for
12   mitigating evidence.  See Williams v. Taylor, 529 U.S. 362, 395-96 (2000); Silva
13   v. Woodford, 279 F.3d 825, 838-46 (9th Cir. 2002); Wallace v. Stewart, 184 F.3d
14   1112, 1117 (9th Cir. 1999); Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir. 1999);
15   Bean v. Calderon, 163 F.3d 1073, 1079 (9th Cir. 1998); Smith v. Stewart, 140 F.3d
16   1263, 1269 (9th Cir. 1998); Hendricks v. Calderon, 70 F.3d 1032, 1043 (9th Cir.
17   1995) (Hendricks II).

18   It is not enough to point to a deficient investigation by capital defense
19   counsel; to prove the defendant was deprived of a fair trial, it is necessary to
20   demonstrate prejudice.  Strickland, 466 U.S. at 693-94.  Kimble contends he was
21   prejudiced by his attorneys' failure to uncover a substantial amount of information
22   relating to his mental health, which would have been admissible mitigation
23   evidence at the penalty phase.

24   A review of Kimble's educational records allegedly would have revealed
25   that, only two years before the crime, when Kimble was in the tenth grade, school
26   officials determined that Kimble had an IQ of 83 and was functioning at a third to
27   fifth grade level.  These school records would also have revealed that Kimble was
28   placed in classes for educationally handicapped children beginning in the seventh

35

1 | grade, and in the ninth grade, was classified as having a learning disorder.

2 |       Kimble intends to prove that, if defense counsel had consulted with a mental

3 | health professional, the expert would have concluded, as did the professional staff

4 | at San Quentin State Prison when they examined Kimble upon admission, that

5 | Kimble probably suffers from "a schizoid or schizotypal personality disorder," that

6 | his "contact with reality is rather borderline," and that there is a "possibility . . . of

7 | a more active thought disorder . . . " (Pet'r Supp. Offer at 22.)  Kimble suggests

8 | that a mental health expert would also have found that Kimble suffered from

9 | "significant organic brain dysfunction," including "significant impairment" in his

10 | mental functions associated with "planning, judgment, cognitive flexibility and

11 | self-monitoring," "severe[] impair[ment]" in his "problem solving and mental

12 | flexibility," and that Kimble's "capacity for behavioral regulation is [also]

13 | impaired." (<u>Id.</u> at 24-27.)  Dr. Nell Riley, a psychologist retained by federal

14 | habeas counsel who examined Kimble, would testify that Kimble has "sustained

15 | periods of depression," experiences delusions, and has "neuropsychological

16 | impairments [that] are exacerbated by major psychiatric illness." (<u>Id.</u> at 27.)

17 | Although Dr. Riley does not identify a precise diagnosis, she states that Kimble's

18 | "symptoms . . . suggest Bipolar II Disorder (Recurrent Major Depressive Episodes

19 | with Hypomanic Episodes)." (<u>Id.</u>)  Dr. Riley concludes that Kimble's "mental

20 | impairments affect all of his life spheres, and his actions must be viewed in light

21 | of his multiple disabilities." (<u>Id.</u>)

22 |       Although these mental deficits do not negate Kimble's criminal culpability

23 | or excuse his participation in the crime, mental health problems of this nature may

24 | raise doubts in jurors' minds about the propriety of a death sentence. <u>See, e.g.,</u>

25 | <u>Wallace</u>, 184 F.3d at 1115-17; <u>Caro v. Calderon</u>, 165 F.3d 1223, 1227 (9th Cir.

26 | 1999); <u>Hendricks II</u>, 70 F.3d at 1044-45, <u>Clabourne</u>, 64 F.3d at 1384-87, <u>Evans v.</u>

27 | <u>Lewis</u>, 855 F.2d 631, 637-39 (9th Cir. 1988).

28 |       In this case, if Kimble is able to elicit evidence consistent with his offer of

1  proof, he may be entitled to relief from the penalty judgment.  Although the case

2  was strong that Kimble was involved in the Margulies' murders — Kimble's

3  fingerprints were in the house, the stereo store was burglarized shortly after the

4  murders, there was no forced entry of the stereo store, the keys to the stereo store

5  and stolen merchandise were in Kimble's house — the case for death was likely

6  considered close by the jury.

7      Among the sentencing factors, the jury was instructed to consider

8  "[w]hether . . . the defendant was an accomplice to the offense and his

9  participation in the commission of the offense was relatively minor."  Former Cal.

10  Penal Code § 190.3(i).  While Kimble's participation was sufficiently established,

11  his role in the offense was not.  Winfrey's testimony — that he did not originally

12  realize he was participating in a burglary but thought that, at night, at the request

13  of the owners, he was simply helping Kimble to move equipment from the store —

14  is inherently suspect.  While one person might be able to bind and gag two people,

15  it would have been a fair inference that more than one person was involved.

16  Kimble did not drive, did not have a car, and lived far from the Margulies'

17  neighborhood.  Cars belonging to Winfrey and Grant were used to remove the

18  merchandise from the stereo store, and they ended up with 92% of the stolen

19  merchandise, whereas Kimble ended up with just 8%.  (12 R.T. 3101.)

20      The course of the jury's deliberations indicates that the jury might have

21  struggled to reach a verdict on penalty.  The jury had convicted Kimble of two

22  counts of first degree murder along with five special circumstances.  The

23  prosecution introduced no additional evidence at the penalty phase.  The defense

24  evidence apparently consumed about an hour of testimony, with the witnesses

25  providing few details about Kimble's background.  (See Clerk's Tr. 354, 355; 13

26  R.T. 3291-3336.)  Nonetheless, the jury deliberated for two and a half days before

27  finally reaching a verdict.  (See Clerk's Tr. 356, 357, 377; 13 R.T. 3388-89, 3404-

28  05.)  Near the end of their first day of deliberations, they asked the trial court for

1    further guidance in light of "the possibility at this time that we will not be able to

2    find a unanimous decision." (13 R.T. 3390; Clerk's Tr. 376.) The next morning,

3    they asked again whether there were "any further criteria that can be used to

4    determine one penalty as opposed to the other . . . ." (13 R.T. 3390-91; Clerk's Tr.

5    375.) After the trial court declined to elaborate on its instructions, the jury retired

6    to deliberate for the remainder of a Friday afternoon, was excused for the weekend

7    and, upon returning on Monday, continued to deliberate for another two hours

8    before finally arriving at a verdict. (Clerk's Tr. 377); cf. Hamilton v. Vasquez, 17

9    F.3d 1149, 1163 (9th Cir. 1994) ("The jury spent three days deliberating in the

10   penalty phase, suggesting that the California jury saw this as a close case.").

11          An evidentiary hearing is required to ascertain what Mr. Walton's

12   investigative efforts were, what his tactical or strategic decisions were in limiting

13   the investigation to the extent he did, and what mental health evidence reasonably

14   would have been uncovered had he performed a competent investigation.

15          **2.    Ineffectiveness at Guilt Phase**

16          Kimble also claims defense counsel were ineffective at the guilt phase

17   because they failed to present evidence of his mental deficits and drug and alcohol

18   use, which allegedly "prevented him from forming the mental state required to

19   make him guilty of first degree murder and/or the special circumstances . . . ."

20   (Pet'r Supp. Offer at 104.)

21          To obtain a conviction for first degree murder, the prosecution was required

22   to prove either that the killings were "willful, deliberate and premeditated," or that

23   they occurred during the course of one of the enumerated felonies and that Kimble

24   had formed "[t]he specific intent to commit burglary, robbery or rape." (Clerk's

25   Tr. 297, 299.) To return a finding that any of the five special circumstances were

26   true, the jury had to be persuaded beyond a reasonable doubt that Kimble, "with

27   the intent to cause death, physically aided or personally committed the act or acts

28   causing death." (Clerk's Tr. 301-305.) In addition, to sustain the felony-murder

based special circumstances (robbery-murder and rape-murder), the prosecutor had to prove beyond a reasonable doubt that the murders were "willful, deliberate and premeditated." (Clerk's Tr. 302-303.)

As these instructions reveal, simply negating premeditation and deliberation would not have eliminated the possibility of first degree murder convictions or death eligibility in this case. The jury could have found Kimble guilty of first degree murder on a felony-murder theory, and could have sustained the multiple murder special circumstance, on the basis of a finding that Kimble intended to commit a burglary, and helped an accomplice kill the Margulies.[19] Thus, to make a difference at the guilt phase, evidence of Kimble's mental problems or intoxication would have had to give rise to a reasonable doubt about Kimble's ability to form the intent to kill, or the intent to commit one of the underlying felonies.

The allegations of the petition appear to be insufficient to sustain a claim of deficient performance or prejudice based on counsel's failure to conduct a mental health investigation for the guilt or special circumstances phases. Although Dr. Riley arrived at several conclusions that call into question Kimble's mental health, she never asserted that Kimble probably did not form the mental intent necessary to sustain the guilt charges or special circumstances.

Nevertheless, because the evidence bearing on this aspect of Kimble ineffectiveness claim will overlap substantially with the evidence bearing on his penalty phase ineffectiveness claim, the Court will include this aspect of Claim 10(E) within the scope of the evidentiary hearing. See Townsend, 372 U.S. at 318; Seidel v. Merkle, 146 F.3d 750, 753-55 (9th Cir. 1998).

---

[19] See People v. Van Ronk, 171 Cal.App.3d 818, 823, 217 Cal.Rptr. 581 (1985) (premeditation and deliberation require substantially more reflection than that required to form intent to kill.)

39

**B.    Claim 3:  Inability to Form *Mens Rea* for Murder**

Claim 3 asserts that Kimble's mental impairments rendered him incapable of premeditating or deliberating, so he is not guilty of capital murder.  He also argues that evidence of his mental impairments should have been presented at both the guilt and penalty phases, since it would explain his criminal conduct and constitutes relevant mitigation evidence under former California Penal Code § 190.3(k).

To the extent Kimble alleges evidence of his mental deficits should have been presented at the penalty phase, this claim is entirely subsumed within Claim 10(E), on which an evidentiary hearing will be held.

Insofar as it relates to the guilt phase, Claim 3 presents "a 'free-standing' claim of 'actual innocence'" based on Kimble's purported inability to have the requisite *mens rea* for criminal culpability.  See Jackson v. Calderon, 211 F.3d 1148, 1164 (9th Cir. 2000) (quoting Herrera v. Collins, 506 U.S. 390, 401 (1993)); Carriger v. Stewart, 132 F.23d 463, 476 (9th Cir. 1997) (en banc).  In recent opinions, the Court of Appeals for the Ninth Circuit has assumed for the sake of decision that a habeas petitioner who made a "'truly persuasive'" showing of actual innocence would be entitled to relief.  See Carriger, 132 F.3d at 476-77 (quoting Herrera, 506 U.S. at 417); Jackson, 211 F.3d at 1165.  Kimble's petition and offer of proof in support of his request for an evidentiary hearing do not allege with specificity facts that would entitle him to an evidentiary hearing on this claim.  Nevertheless, because the evidence bearing on Kimble's mental health relevant to Claim 10(E) is also relevant to this claim, the Court will include Claim 3 within the scope of the evidentiary hearing.

**C.    Claims 2, 4, & 5:  Incompetence to Stand Trial**

In Claim 2, Kimble alleges that as a result of his mental disabilities, which were exacerbated by physical and sexual abuse and the use of drugs while in jail awaiting trial, he was not competent to stand trial.  Claim 4 is similar, but it

1  alleges more specifically that Kimble was incapable of validly consenting to
2  certain actions taken before and during trial, such as the replacement of three
3  jurors by alternates.  In Claim 5, Kimble argues that as a result of his mental
4  deficits, he was in effect denied the right to be "mentally present" during his trial.
5  Although these three claims are formulated in different terms, all are based on the
6  same factual allegations about Kimble's mental state, and they raise a single legal
7  claim for relief:  incompetence to stand trial.  See Drope v. Missouri, 420 U.S.
8  162, 171 (1975) (comparing prohibition against trying incompetent defendants to
9  trials in absentia, because "the mentally incompetent defendant, though physically
10  present in the courtroom, is in reality afforded no opportunity to defend himself.")

### 1.    Legal Standard for Incompetence Claims

12         "It has long been accepted that a person whose mental condition is
13  such that he lacks the capacity to understand the nature and object of the
14  proceedings against him, to consult with counsel, and to assist in preparing his
15  defense may not be subjected to trial." Drope, 420 U.S. at 171.  Not only does the
16  "Due Process Clause afford[] an incompetent defendant the right not to be tried,"
17  but in addition, "a State's 'failure to observe procedures adequate to protect a
18  defendant's right not to be tried or convicted while incompetent to stand trial
19  deprives him of his due process right to a fair trial.'" Medina v. California, 505
20  U.S. 437, 449 (1992) (quoting Drope, 420 U.S. at 172).
21         The test for competence to stand trial is whether the defendant "has
22  sufficient present ability to consult with his lawyer with a reasonable degree of
23  rational understanding — and whether he has a rational as well as factual
24  understanding of the proceedings against him." Dusky v. United States, 362 U.S.
25  402 (1960) (per curiam) (internal quotation marks omitted); accord, Godinez v.
26  Moran, 509 U.S. 389, 396 (1993); Boag v. Raines, 769 F.2d 1341, 1343 (9th Cir.
27  1985).  "[C]ompetence to stand trial does not consist merely of passively
28  observing the proceedings.  Rather, it requires the mental acuity to see, hear and

41

1   digest the evidence, and the ability to communicate with counsel in helping

2   prepare an effective defense." Odle v. Woodford, 238 F.3d 1084, 1089 (9th Cir.

3   2001); see also De Kaplany v. Enomoto, 540 F.2d 975, 979 (9th Cir. 1976) (en

4   banc) ("An orientation as to time and place and some recollection of events is not

5   enough.").  Nevertheless, competency to stand trial requires "nothing more than

6   that a defendant have some minimal understanding of the proceedings against

7   him." United States v. Hernandez, 203 F.3d 614, 620 n.8 (9th Cir. 2000). "[N]ot

8   every manifestation of mental illness demonstrates incompetence to stand trial;

9   rather, the evidence must indicate a present inability to assist counsel or

10  understand the charges." Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir.

11  1995) (citation and internal quotation marks omitted).  "Similarly, neither low

12  intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be

13  equated with mental incompetence to stand trial." Id.; accord, United States v.

14  Timbana, 222 F.3d 688, 700-701 (9th Cir. 2000); Hernandez v. Ylst, 930 F.2d 714

15  (9th Cir. 1991); De Kaplany, 540 F.2d at 984-85.

16          To obtain an evidentiary hearing on this claim, Kimble must point to

17  "substantial evidence of incompetence." Cuffle v. Goldsmith, 906 F.2d 385, 386

18  (9th Cir. 1990) (citation and internal quotation marks omitted); Boag, 769 F.2d at

19  1343.  "Although no particular facts signal incompetence, suggestive evidence

20  includes a defendant's demeanor before the trial court, previous irrational

21  behavior, and available medical evaluations." Moran v. Godinez, 57 F.3d 690,

22  695 (9th Cir. 1994).

23          A defendant's demeanor at trial is important but not dispositive. See Drope,

24  420 U.S. at 179; Odle, 238 F.3d at 1088 ("calm behavior in the courtroom is not

25  necessarily inconsistent with mental incompetence").  "[T]he defendant's inability

26  to assist counsel can, in and of itself, constitute probative evidence of

27  incompetence, and defense counsel will often have the best-informed view of the

28  defendant's ability to participate in his defense." Medina, 505 U.S. at 450.

1   Conversely, "defense counsel['s] silence on this subject during the [state court

2   proceedings] is some evidence that he showed no signs of incompetence at that

3   time." United States v. Lewis, 991 F.2d 524, 528 (9th Cir. 1993).

4              **2.   Whether the Trial Court Erred in Failing to Hold a**

5                    **Competency Hearing**

6              Kimble points to two episodes that he alleges should have prompted

7   the trial court to question his competency.  Neither of these episodes, however,

8   would have caused a reasonable trial judge to doubt Kimble's competency to stand

9   trial.

10             The first episode occurred early in the case.  At a trial setting conference on

11  December 8, 1978, Mr. Grumman proposed that pretrial motions be heard in

12  March 1979, and also asked that the trial date be set at that time.  (1 R.T. A13-

13  A14.)  Kimble's statutory right to a speedy trial, however, entitled him to demand

14  that his trial start by January 8, 1979, absent good cause.  Despite Mr. Grumman's

15  insistence that he would not be ready for trial by January, Kimble refused to waive

16  his right to a speedy trial.  (1 R.T. A15.)  The trial court vacated the March 1979

17  hearing date and set the case for trial in two weeks, stating his expectation that Mr.

18  Grumman would then declare that he was not ready for trial and would be able to

19  demonstrate good cause for a continuance.  (1 R.T. A15-A16.)  Before leaving the

20  bench, the trial judge cautioned: "Mr. Kimble, . . . You are 18 years old.  You

21  walked into the biggest ditch in the world. . . .  Do what your lawyer tells you."  (1

22  R.T. A16-A17.)  When the litigants returned on December 22, Mr. Grumman

23  represented that he had "discussed the matter with [Kimble] now again, and he is

24  willing now to accept that continuance for trial setting . . . ."  (1 R.T. A20.)

25  Kimble concurred.  (1 R.T. A21.)

26             Although Kimble's initial refusal to consent to the continuance was not a

27  wise decision, it was not bizarre or erratic behavior of a nature that would call into

28  question his mental competency.  Standing alone, this episode demonstrates only

43

1  that Kimble could be a difficult client.  At the time of the December 8, 1978,

2  conference, the trial judge had no information indicating that Kimble had a history

3  of prior irrational behavior.  Nor was he presented with any medical evaluations

4  suggesting that Kimble's mental health was questionable.  In short, the

5  information known to the trial court would not have "created a sufficient doubt of

6  [Kimble's] competence to stand trial to require further inquiry on the question."

7  Drope, 420 U.S. at 180.

8       The second episode occurred six months later, in June 1979, when Kimble

9  learned that Mr. Grumman had been suspended from the practice of law.  The trial

10  court initially appointed Mr. Walton to inform Kimble of his legal rights and

11  responsibilities in light of Mr. Grumman's suspension.  (1 R.T. A32-A33.)  Mr.

12  Walton reported to the trial court that "Mr. Kimble, who is a young man of 19, of

13  reasonable intelligence, seems to feel that one of Mr. Grumman's associates can

14  pick up the case and just go ahead and try it."  He clarified, however, that the

15  associate identified by Kimble "has been practicing less than a year."  (1 R.T.

16  A33.)  Kimble did not display any inappropriate behavior.  On Mr. Walton's

17  suggestion, the case was continued for two weeks to enable Kimble to consider his

18  options and arrange alternative representation if he so desired.  (1 R.T. A34-A35.)

19  When the case was next on calendar, before asking Kimble whether he had

20  changed his mind, the trial court reminded Kimble that the associate had been a

21  lawyer for less than a year, had never tried a felony case, and would feel intense

22  pressure having to defend a capital murder case.  The trial judge suggested that the

23  pressure might cause the associate to make mistakes that he might otherwise not

24  make.  (1 R.T. A36-A37.)  He then asked Kimble whether he had considered his

25  options and made a decision.  Kimble said that he had and requested, "Could you

26  appoint Mr. Watson [sic]?"  The trial court then confirmed that Kimble was

27  seeking to substitute Mr. Walton for Mr. Grumman's associate.  (1 R.T. A37-

28  A38.)

1    As with the incident on December 8, 1978, this episode would not prompt
2    an experienced trial judge to inquire into the defendant's competency to stand
3    trial.  Kimble was not boisterous or obstreperous, and unlike the December 8
4    fiasco, there is no suggestion that Kimble persisted in following a self-destructive
5    path for even a brief period of time.  At the first conference, Kimble was simply
6    informed of the associate's lack of experience and given an opportunity to consult
7    with his family.  (1 R.T. A35.)  Kimble's request to continue with one of Mr.
8    Grumman's associates reflects little more than that he had developed some sort of
9    bond with the attorney.  Once he was informed that the associate could not
10   adequately represent him, Kimble acceded to the withdrawal of Mr. Grumman's
11   firm and the appointment of Mr. Walton.  This episode would not have created "a
12   real and substantial doubt as to [Kimble's] competency."  Boag, 769 F.2d at 1343.

13   Kimble identifies no other record-based facts that he contends should have
14   prompted the trial court to inquire into Kimble's competency.  Taken together or
15   separately, these two episodes did not amount to "substantial evidence of
16   [Kimble's] incompetence."  Cuffle, 906 F.2d at 392.  Hence the trial court's failure
17   to conduct a competency hearing did not deprive Kimble of due process.  Lewis,
18   991 F.2d at 527-28.

19        **3.    Whether to Hold a Hearing on Kimble's Competence**

20   "[E]ven if the evidence before the trial judge was insufficient to raise
21   a good faith doubt with respect to [a defendant's] competency, he would still be
22   entitled to [a hearing during habeas review] if it now appears that he was in fact
23   incompetent."  Steinsvik v. Vinzant, 640 F.2d 949, 954 (9th Cir. 1981); see, e.g.,
24   Odle, 238 F.3d at 1090; Moran II, 57 F.3d at 696.

25   Kimble points to the diagnosis of a staff psychologist at the San Quentin
26   State Prison only a few months after trial to the effect that Kimble probably suffers
27   from a "schizoid or schizotypal personality disorder," with "suggestions of
28   magical thinking . . . to the extent that his contact with reality is rather borderline."

45

1   The psychologist also observed that there was a "possibility . . . of a more active

2   thought disorder which he attempts to mask . . . ." (Pet'r Supp. Offer at 22.)

3       Kimble also tenders the conclusion of Dr. Riley that Kimble "was

4   delusional" and "has little insight into the nature and severity of his disorder and

5   does not understand that his thoughts are disordered." She further opines that his

6   mental impairments "are quite prominent and appear to be long-standing. Had

7   [he] undergone neuropsychological assessment at the time of his trial, these

8   markers of organic brain dysfunction would have been quite apparent." (Pet'r

9   Supp. Offer at 27.)

10      Habeas counsel also assert that, during his pretrial incarceration, Kimble

11  was "mentally unstable" and "[w]hile in the middle of a conversation he would 'go

12  crazy,' yelling and screaming at whomever he had been talking to." (Pet'r Supp.

13  Offer at 33.) They allege that, during this period, Kimble "was seen sitting in his

14  cell talking to himself, yelling and screaming in seeming desperation, speaking in

15  fragments, and babbling incoherently." (Id.) They offer to prove that Kimble

16  "seemed [to be] . . . in another world — he would move about slowly, with a blank

17  expression on his face and it was as if he was deaf." (Id. at 34.) Kimble allegedly

18  was "unable to provide any relevant information" to his attorneys at trial, and

19  exhibited a strange demeanor, which alternated between joking and periods of

20  "deep depression marked by psychic numbness." Jurors report that Kimble

21  frequently looked "detached." (Id. at 36-37.)

22      These allegations call into question Kimble's ability to assist his attorneys.

23  See Drope, 420 U.S. at 171; Medina, 505 U.S. at 450. Together with the

24  psychological diagnoses offered by San Quentin staff and Dr. Riley, they cast

25  some doubt on Kimble's competency at the time of trial. The Court need not

26  decide whether the allegations are sufficient to mandate an evidentiary hearing on

27  Kimble's competency claim, however. Because the question is debatable, and the

28  evidence bearing on Kimble's competence is likely to overlap with the mental

1   health evidence relevant to his ineffective assistance of counsel claim, the Court

2   will include the incompetency claim in the scope of the evidentiary hearing.

3       **D.    Claim 1:  Incompetence to Waive <u>Miranda</u> Rights**

4       In Claim 1, Kimble alleges that the statement he made to the police after his

5   arrest should not have been admitted at trial, because his waiver of <u>Miranda</u> rights

6   was invalid.  He claims he was not competent to waive his rights, both because of

7   his mental impairments and because he was under the influence of intoxicants

8   when questioned.

9       Just as a defendant may not be tried while incompetent, "he may not waive

10  his right to counsel . . . unless he does so 'competently and intelligently.'"  <u>Moran</u>

11  <u>I</u>, 509 U.S. at 396 (quoting <u>Johnson v. Zerbst</u>, 304 U.S. 458, 468 (1938)); <u>Derrick</u>

12  <u>v. Peterson</u>, 924 F.2d 813, 818-21 (9th Cir. 1990).

13      When Kimble was arrested, he was advised of his rights under <u>Miranda v.</u>

14  <u>Arizona</u>, 384 U.S. 436 (1966).  Kimble purported to waive those rights and agreed

15  to speak to the police.  (10 R.T. 2599-2602.)  He denied any knowledge of or

16  connection to the events at the Margulies' residence or stereo store.  When the

17  interrogating officers indicated they did not believe him, Kimble asked to "speak

18  to my lawyer," and the interview ended.  (10 R.T. 2602-17.)

19      The transcript of the interrogation does not demonstrate that Kimble was

20  mentally incompetent, but nor does it contain instances of such lucidity or insight

21  as to definitively negate that possibility.  <u>Cf.</u> <u>Shackleford v. Hubbard</u>, 234 F.3d

22  1072, 1080 (9th Cir. 2000) (transcript showed defendant asked "lucid questions,"

23  and "was coherent and articulate throughout the interrogation").  For example,

24  after first affirming that his name was Eric Kimble with a "yeah," Kimble

25  produced a series of "uh-huh"s in response to the next six questions about whether

26  he understood his <u>Miranda</u> rights.  (10 R.T. 2599-2600.)  When asked next

27  whether he wanted to speak to the officers, he again responded, "Uh-huh," and

28  when then asked whether he had any questions about his rights, he again said,

47

1  "Uh-huh."  Cf. Amaya-Ruiz v. Stewart, 121 F.3d 486, 494 (9th Cir. 1997)

2  (defendant said "No" when asked if he had any questions).  This response

3  prompted the officer to repeat several questions about whether Kimble understood

4  his Miranda rights, all of which were answered with an "uh-huh," until finally, the

5  officer switched his grammatical strategy and said, "Okay.  No questions?"  To

6  this Kimble responded, "No questions."  (10 R.T. 2600-2601.)  This indicates

7  either that Kimble did not understand the officer's first question about whether he

8  had any questions, or that he changed his mind about having questions.  The

9  majority of Kimble's responses to the officer's remaining questions were

10  monosyllabic affirmatives or negatives, although he also frequently repeated the

11  officer's question instead of answering it.  (See 10 R.T. 2601-17.)

12      Standing alone, the evidence from the transcript is insufficient to cast doubt

13  on Kimble's ability to understand and validly waive his Miranda rights.  But the

14  additional psychological evidence of Kimble's mental deficiencies and the

15  allegations about Kimble's bizarre behavior discussed previously, to the extent

16  they call into question Kimble's competence to stand trial, also warrant inquiry

17  into Kimble's competence to waive his Miranda rights at the time he was arrested.

18  Cf. Moran I, 509 U.S. 389 (standard for assessing competency to waive counsel is

19  identical to standard for assessing competency to stand trial).  For these reasons,

20  the Court will include Claim 1 within the scope of the evidentiary hearing.

21  V.    Conflict of Interest Claim

22      In Claim 9, Kimble complains that his pretrial counsel, Barry Jon Grumman,

23  failed to provide competent legal representation during the ten months that he

24  represented Kimble.  During this time, Mr. Grumman was being prosecuted by the

25  Los Angeles District Attorney's office on charges of attempted receipt of stolen

26  property.  This allegedly gave rise to a conflict of interest for Mr. Grumman, who

27  became more concerned with fighting the District Attorney's charges against

28  himself than fighting the same District Attorney's charges against his client.  As a

48

1  result, Kimble alleges, Mr. Grumman failed to investigate either the crimes

2  Kimble was charged with or Kimble's background.

3      The Court will assume for the purposes of analyzing this claim that Mr.

4  Grumman had "an actual conflict of interest," and that it "adversely affected" his

5  performance. Cuyler v. Sullivan, 446 U.S. 335, 348 (1980).  It does not follow,

6  however, that Kimble was deprived of his Sixth Amendment right to the effective

7  assistance of counsel.  Mr. Grumman was relieved on June 25, 1979, and Mr.

8  Walton replaced him.  Mr. Walton then had fifteen months to prepare for trial.

9  Kimble does not allege that Mr. Walton lacked the time to adequately prepare for

10  trial; instead, he alleges that Mr. Walton failed to behave as a reasonably

11  competent defense attorney should have.  That is a different claim, however. (See

12  Claim 10.)

13      If a defendant receives effective assistance of counsel at trial, then it is

14  irrelevant that one of his prior attorneys had a conflict of interest.  See United

15  States v. Allen, 831 F.2d 1487 (9th Cir. 1987) (despite fact that pre-trial counsel

16  had unwaivable conflict of interest, defendant received effective assistance of

17  counsel from different, independent counsel who subsequently represented him at

18  trial).  Were the rule otherwise, no court could cure a conflict of interest by

19  substituting new counsel.

20      In this case, there is no allegation that Mr. Grumman's failure to investigate

21  Kimble's case somehow prevented Mr. Walton from independently conducting his

22  own investigation.  Kimble does cursorily allege that Mr. Grumman "did nothing

23  to benefit Petitioner's defense, and much to prejudice it." (2d Am. Pet. at 42.)  But

24  his factual allegations do not substantiate this claim.  Kimble contends that

25  because Mr. Grumman failed to undertake certain forensic tests, exculpatory

26  evidence was not preserved and is no longer available.  If Mr. Grumman had

27  contributed to the loss or destruction of such evidence, there might be merit to this

28  claim.  But Kimble does not allege that the evidence Mr. Grumman neglected to

gather disappeared before Mr. Walton had an opportunity to investigate it. In short, even if Mr. Grumman suffered from a conflict of interest, it did not infect Mr. Walton's subsequent representation of Kimble. Whether Kimble received the representation to which the Sixth Amendment entitled him therefore depends not on what Mr. Grumman did, but on what Mr. Walton did. See Allen, 831 F.3d at 1502-1503. Claim 9 must be denied.

## VI. Ineffective Assistance of Counsel

In Claim 10, Kimble alleges that Mr. Walton failed to adequately represent him at the guilt and penalty phases of his trial. The portion of this claim alleging ineffective assistance of counsel based on Mr. Walton's failure to investigate and present mitigating evidence at the penalty phase (Claim 10(E)) has already been discussed, and the Court will hold an evidentiary hearing on that claim. The question presented by the remaining aspects of Claim 10 is whether to include them within the scope of the hearing.

### A. Claim 10(B & D): Inadequate Investigation of Crimes

In Claim 10(B), Kimble alleges that Mr. Walton was ineffective because he failed to interview the Margulies' neighbors, Ted Dietlin and Mildred Shane, who saw one or more young black men near the Margulies' house on the afternoon of the murders. In Claim 10(D), Kimble alleges that if Mr. Walton had consulted forensic experts to assist him in analyzing the murder scene evidence, he could have more effectively rebutted the prosecution's theory of how the crimes occurred. The defense allegedly could have used this evidence to show that Kimble did not rape Avone Margulies, and also to show that the Margulies were probably shot in a panic by the intruders after one of the Margulies set off the high-pitched nerve-shattering house alarm. Kimble also criticizes Mr. Walton for not introducing the testimony of an eyewitness identification expert, who allegedly could have explained to the jury the difficulties witnesses experience in correctly identifying people, especially people of other races; he claims this would have

1    undermined the force of Mr. Dietlin's in-court identification of Kimble.  Finally,

2    Kimble alleges that Mr. Walton failed to investigate and interview other

3    "percipient witnesses," whose testimony allegedly would have established that

4    even if Kimble was present in the Margulies' residence, he was accompanied by

5    others who actually committed the murders.  In his offer of proof, Kimble names

6    several individuals who he claims planned the burglary of the Margulies' store,

7    and who he says were present during the burglary and murders at the Margulies'

8    house.  Kimble attributes the murders to them, claiming that he himself "was

9    searching a different area of the house when the killings took place and fled when

10   he heard the shots."  (Pet'r Supp. Offer at 100-101.)

### 1.    Failure to Use Eyewitness Identification Expert

12          Kimble claims an expert on eyewitness identification could have

13   explained to the jurors a number of well-established conclusions about the

14   unreliability of eyewitness identifications, so that they could give appropriate

15   weight to the testimony of Ted Dietlin and Mildred Shane, who reported

16   encountering a young black man in the vicinity of the Margulies' house on the

17   afternoon of the murders.  The expert could have explained, for example, that

18   perception of an event is affected by lighting, distance from the observer, duration

19   of the event, and the race of the observer and the observed, and that observers tend

20   to overestimate the duration of events they perceive.  The expert also could have

21   explained how an observer's memory of a perceived event can change over time as

22   a result of subsequent exposure to suggestive information (such as seeing someone

23   in a lineup).

24          This was not a trial in which eyewitness identifications were crucial to

25   establishing Kimble's presence in the Margulies' house or his identity as the killer.

26   Fingerprint evidence, not eyewitness testimony, placed Kimble in the house.  The

27   contradictions between the two neighbors' descriptions of events were stark,

28   prompting defense counsel to criticize the prosecution for failing to bring in

1    another witness (another neighbor who was interviewed by the police) to serve as

2    a "tie-breaker." (8 R.T. 3085.) Under these circumstances, it was not

3    professionally unreasonable for Mr. Walton to expose the weaknesses in the

4    eyewitness identification testimony through cross-examination and argument,

5    rather than through the use of an expert. Cf. United States v. Labansat, 94 F.3d

6    527, 530 (9th Cir. 1996) (reasonably competent defense attorney unlikely to hire

7    eyewitness identification expert, in part because "weaknesses in eyewitness

8    identification testimony can ordinarily be revealed by counsel's careful cross-

9    examination of the eyewitnesses.")

10      At trial, Ms. Shane was unable even to identify Kimble as the man she saw

11    running down the hill. She testified only that Kimble shared the same physique

12    and hair style as the man she saw. (8 R.T. 2073-74.) On cross-examination, Mr.

13    Walton elicited the following admissions, reflecting Ms. Shane's brief perception

14    and uncertain recollection of the event:

15

16        Q      And you think that person was about 5'6", 5'7"?

       A      *What I can recall, yes.*

17

18        Q      About what do you feel the person weighed?

       A      *I wouldn't know.* I judged him by the size of my son,

19             and I thought he'd be about a 36 chest, about 5'6", 5'7".

20          . . .

21        Q      What kind of suit . . . [do] you recall having seen?

22        A      *He was running pretty quickly. I didn't know what I was looking at.* Just that I saw this guy running in what

23             appeared to be a navy [blue] suit.

24        Q      Did you see the jacket apparently opened?

25        A      *I couldn't tell you.*

26    (8 R.T. 2078-80 (emphasis added).) Mr. Walton also established that, in direct

27    contrast to Ted Dietlin's recollection of the man he encountered, the man Ms.

28    Shane remembered seeing was not wearing a hood on his head, nor was he even

1   wearing a hooded garment.  (8 R.T. 2084.)

2       Ted Dietlin's testimony was more incriminating than Ms. Shane's:  At trial,

3   Mr. Dietlin positively identified Kimble as the man he saw hiding in the bushes

4   beside the Margulies' house on the day of the murders.  (7 R.T. 1786-87.)

5   Although, if believed, this testimony did not demonstrate that Kimble entered the

6   Margulies' house, it did provide some support for the prosecution's theory that

7   Kimble acted alone, or at least was prepared to commit the burglary on his own

8   (even if he needed a ride to and from the house).  Mr. Walton did not leave this

9   testimony unchallenged, however.  He cross-examined Mr. Dietlin extensively on

10   his prior statements to the police, made on the day of the crimes, in which he had

11   described the man he observed as about 6' tall and about 170 pounds (larger than

12   Kimble), and had admitted that he "could not describe him facially."  (7 R.T.

13   1796.)  Mr. Walton also elicited Mr. Dietlin's admission that he was unable to

14   identify Kimble in a set of photographs about a week after the event, and that he

15   subsequently tentatively identified Kimble only as "similar" at a lineup of six

16   black males.  (7 R.T. 1796-97, 1803-13.)  In his closing argument, Mr. Walton

17   emphasized the differences between the two neighbors' recollections of what they

18   saw, and Mr. Dietlin's failure to accurately describe Kimble or identify him from a

19   photo lineup.  He pointed out again that it was only *after* observing Kimble's face

20   in the photographs (without at that time recognizing him) that Dietlin told a police

21   officer, while observing the lineup, that Kimble looked "similar" to the man he

22   had seen in the bushes.  (8 R.T. 3127-33.)

23       As the Court of Appeals for the Ninth Circuit has explained, competent

24   defense counsel "can easily expose through cross-examination and closing

25   argument the unreliability, if any, of delayed eyewitness identifications."

26   Labansat, 94 F.3d at 529.  Mr. Walton did so at Kimble's trial.  It was not

27   professionally unreasonable to decline to employ expert testimony to provide

28   *additional* support for the argument that the two neighbors' testimony was

1    unreliable.  This aspect of Claim 10(D) therefore lacks merit.

2              **2.    Inadequate Investigation of Accomplices**

3              Kimble also claims that Mr. Walton was ineffective in failing to

4    interview Ted Dietlin and Mildred Shane prior to trial.  He does not allege,

5    however, that interviewing Mr. Dietlin would have made any difference either to

6    Mr. Dietlin's testimony or to any other aspect of the trial.  Thus, this portion of the

7    claim fails for lack of prejudice.  See Strickland, 466 U.S. at 691-97.

8              In contrast, Kimble does explain why the failure to interview Ms. Shane was

9    prejudicial.  At trial, Ms. Shane testified that after she saw a young black man run

10   down the street with a black briefcase around 1:30 p.m., a small brown car driven

11   by two other young black men drove by, stopped momentarily, and then continued

12   on down Doheny Drive.  (8 R.T. 2074-76.)  In fact, Kimble alleges, Ms. Shane

13   saw the man with the briefcase get into the car when it stopped.  If Mr. Walton had

14   interviewed Ms. Shane before trial, he would have know this, Kimble claims, and

15   would have been able to elicit this information at trial.  Ms. Shane's testimony

16   would have supported the defense argument that more than one person

17   participated in the crimes at the Margulies' residence.

18             Kimble's allegations about Mr. Walton's pretrial investigation of witnesses,

19   if proved, would demonstrate that Mr. Walton failed to investigate the strengths

20   and weaknesses of the prosecution's case before trial.  Police reports provided to

21   the defense in the course of pretrial discovery listed Ms. Shane as a percipient

22   witness.  She was apparently one of only a few witnesses in the Margulies'

23   neighborhood identified by the police.  What these neighbors saw was important

24   to the defense theory of the case.  Nevertheless, Mr. Walton interviewed none of

25   these witnesses.  Such a failure to investigate the State's case "puts at risk both the

26   defendant's right to an ample opportunity to meet the case of the prosecution and

27   the reliability of the adversarial testing process."  Kimmelman v. Morrison, 477

28   U.S. 365, 385 (1986) (citation and internal quotation marks omitted).

1    A defense counsel's failure to seek to interview government witnesses, in

2  the absence of an adequate reason not to do so, generally falls "outside the range

3  of reasonable professional assistance." Turner v. Duncan, 158 F.3d 449, 457 (9th

4  Cir. 1998).  Without interviewing "the witnesses that the government planned to

5  call to testify, [defense counsel] could not have known how they would testify and

6  what information he should try to elicit on cross-examination or would otherwise

7  need to present in response."  Id. at 456; see also United States v. Tucker, 716

8  F.2d 576, 583 (9th Cir. 1983) (Defense counsel could not "make an informed

9  assessment of the strengths and weaknesses of the government's case without

10  attempting to ascertain specifically what the testimony of the government's

11  witnesses would be."); cf. Lord v. Wood, 184 F.3d 1083, 1095-96 (9th Cir. 1999)

12  (decision whether to present testimony generally requires lawyer to interview

13  witness); LaGrand v. Stewart, 133 F.3d 1253, 1274 (9th Cir. 1998) (trial counsel's

14  failure to interview all witnesses was not deficient where prior counsel had

15  previously interviewed them, and trial counsel reviewed transcripts of these

16  interviews and "personally interviewed the only eyewitness"); Eggleston v. United

17  States, 798 F.2d 374, 376 (9th Cir. 1986) (trial counsel need not interview witness

18  if witness's account is fairly known to counsel).

19    In this case, there is no suggestion that Mr. Walton had a sound reason to

20  forego interviewing Ms. Shane.  Although "counsel is strongly presumed to have

21  rendered adequate assistance," it is impossible to conclude on the basis of this

22  record that the failure to interview her reflects "the exercise of reasonable

23  professional judgment." Strickland, 466 U.S. at 690; Turner, 158 F.3d at 456.  In

24  his closing argument to the jury, Mr. Walton explained that "the issue which is

25  very important in this case [is] whether there was more than one person in the

26  Margulies home," because if there were others, then the jury could not conclude

27  beyond a reasonable doubt that Kimble had personally killed the Margulies.  He

28  suggested that Ortez Winfrey was "hiding something or covering his tracks."  (12

R.T. 3104.)  But Mr. Walton offered no evidence that Ortez Winfrey or anyone else accompanied Kimble to the house.  The prosecutor pounced on this glaring absence of evidence in his rebuttal argument.  (12 R.T. 3145.)  Given that Mr. Walton apparently made a tactical choice to present an accomplice defense, it was almost certainly deficient for him not to investigate that defense before trial, assess its strengths and weaknesses, and present evidence — if evidence was available — to support it.  See Siripongs, 35 F.3d at 1310.

Had Ms. Shane testified that she saw the man running down the hill with the briefcase get into a car with two other young black males and speed off, this would have been strong evidence that Kimble received assistance in committing the burglary-homicide at the Margulies' residence.  Although the jurors knew that others were involved in the stereo store burglary, they had no direct evidence that anyone else participated in the murders.  Defense counsel could only point to the evidence that Kimble did not drive, and argue that it would have been difficult for Kimble acting alone to subdue both of the Margulies simultaneously.  (12 R.T. 3083-84, 3104-17.)  Even though Ms. Shane did not positively identify the man she saw running down the hill as Kimble, if the jurors concluded that it was indeed Kimble, then the fact that she saw him being picked up by accomplices near the Margulies' house would have strengthened the defense argument that Kimble did not act alone.  If Kimble was assisted by others when he first approached the Margulies' house at 1:30 p.m., then it is likely that those same accomplices returned with him three hours later when the burglary and murders were committed.

The question of whether Kimble acted alone at the Margulies' residence was important at trial, not because it was relevant to the question of whether Kimble was guilty of first degree murder, but because it was relevant to whether Kimble should be sentenced to death.  As previously mentioned, if the jurors accepted the fingerprint evidence, and the other evidence suggesting that Kimble was in the

1   Margulies' house, then they would have found Kimble guilty of first degree

2   murder on a felony-murder theory, regardless of how many other people might

3   also have participated.  But Kimble's role in the homicides was relevant to the

4   special circumstance allegations and to the jurors' ultimate assessment of the

5   appropriate penalty.  The prosecutor argued that Kimble had acted alone.  In

6   response, defense counsel argued that Ortez Winfrey's testimony was full of

7   inconsistencies because Winfrey was "hiding something or covering his tracks."

8   He continued:

9           That takes us now to the issue which is very important in
        this case of whether there was more than one person in the
10      Margulies home.  It is the clear theory of the district attorney
        that Eric Kimble alone went into that house, and Eric Kimble
11      alone did everything that was done, and the reason that the
        district attorney is urging that theory upon you with such fervor
12      is that if you find that there was more than one person in that
        house, or if you have a reasonable doubt on that issue, you will
13      not be able to find any of the special circumstances to be true.
        The reason for that is that if there was a second or third, or
14      whatever, in that house, there is no evidence that points to one
        of them any more than another of them as being the person who
15      actually killed Mr. and Mrs. Margulies, and in order to find any
        of the special circumstance in this case to be true, you have to
16      find unanimously and beyond a reasonable doubt that Eric
        Kimble personally with his own hands committed the murders
17      or physically assisted in them, and that requires kind of an
        assault-and-battery type of conduct.
18
            So the district attorney closes his mind to any other
19      possibilities, because if he opens his mind to them or opens
        your minds to the possibility that there was a second or
20      possibly a third person in that house, he knows that a
        conscientious jury could not find to be true any of the special
21      circumstances which qualify a defendant for the death penalty.

22   (12 R.T. 3104-3105.)

23          Moreover, the 1977 statute, like California's current statute, directed the

24   jurors to take into account when making the penalty determination "[w]hether or

25   not the defendant was an accomplice to the offense and his participation in the

26   commission of the offense was relatively minor."  Former Cal. Penal Code

27   § 190.3(a, i).  The United States Supreme Court "has recognized time and again

28   that the level of criminal responsibility of a person convicted of murder may vary

57

1  according to the extent of that individual's participation in the crime." <u>Sumner v.</u>

2  <u>Shuman</u>, 483 U.S. 66, 79 (1987) (citing <u>Tison v. Arizona</u>, 481 U.S. 137 (1987) and

3  <u>Enmund v. Florida</u>, 458 U.S. 782 (1982)). An individual's participation in a crime

4  "may be sufficient to support a murder conviction, but in some cases it may not be

5  sufficient to render death an appropriate sentence . . . ." <u>Id.</u> at 79-80. The

6  defendant's role in the offense in comparison to the roles played by accomplices

7  can be a crucial factor in mitigation. <u>See</u> <u>Lockett v. Ohio</u>, 438 U.S. 586, 608

8  (1978) (plurality); <u>Enmund</u>, 458 U.S. at 794-800; <u>Siripongs</u>, 35 F.3d at 1315.

9       The Court will hold an evidentiary hearing on the question of whether

10  defense counsel was ineffective for failing to interview Mildred Shane and failing

11  to investigate an accomplice defense.

12       **3.    Inadequate Investigation of Forensic Evidence**

13       The prosecution introduced testimony by police officers and experts

14  concerning fingerprints, ballistics, a vaginal sample from Avone Margulies, the

15  blood found in the house, blood samples taken from the primary suspects, and the

16  injuries to the victims and the manner in which they died. This evidence was used

17  to support the prosecution's argument that Kimble was in the house, that Kimble

18  (not Winfrey or Grant) raped Avone Margulies, and to reconstruct the probable

19  sequence of events inside the house. Kimble alleges that defense counsel

20  conducted no independent testing of any of this evidence. He further alleges that

21  defense counsel should have employed independent forensic experts to advise

22  him, so that he could better cross-examine the prosecution witnesses and thereby

23  demonstrate the weakness of their conclusions. Had he done so, Kimble claims,

24  the jury probably would have concluded that the killings were not premeditated,

25  and also would have acquitted Kimble of rape.

26       Although twenty-two pages of the offer of proof is devoted to these

27  allegations, much of it is vague and repetitive. For example, Kimble claims that

28  "[t]he services of forensic experts would have enabled trial counsel to present

1  evidence that the killings could not have occurred in the manner postulated by the
2  prosecution, and present evidence exonerating Petitioner or mitigating Petitioner's
3  culpability." (Pet'r Supp. Offer at 71-72.)  By itself, this allegation is far too
4  vague to warrant an evidentiary hearing.  "An evidentiary hearing is not required
5  on allegations that are conclusory and wholly devoid of specifics."  Campbell, 18
6  F.3d at 679 (citation and internal quotation marks omitted).  With the exception of
7  the evidence bearing on the rape, and the movements of the Margulies' within the
8  house, Kimble's more specific allegations of ineffectiveness do not bear out this
9  sweeping assertion.  These allegations are discussed below.

10                    a.     **Evidence bearing on rape charge**

11                    Kimble argues that Mr. Walton should have employed an
12  expert to assist in the analysis of the bodily fluid evidence bearing on the rape
13  charge.  An expert allegedly could have explained the relevance of a man's status
14  as a secretor or nonsecretor to the determination of whether he could have
15  produced the sperm recovered from Avone Margulies (thereby casting doubt on
16  the prosecution's argument that the bodily fluid evidence excluded Winfrey as the
17  rapist).  The expert could have demonstrated that the medical examiner's
18  testimony that sexual intercourse had occurred within six hours of death was
19  unfounded.  The expert could have suggested that the defense undertake enzyme-
20  testing of the seminal fluid, or cast doubt on the prosecution's case by explaining
21  the significance of the police's failure to undertake such tests (which might have
22  narrowed the identity of the donor of the seminal fluid more than simple blood-
23  type analysis).  And the expert could have enabled defense counsel to demonstrate
24  that the use of a vaginal smear, instead of a vaginal wash, recovered insufficient
25  material to accurately identify the source of the seminal fluid (thereby casting
26  doubt on the prosecution's contention that the donor was of blood-type A).  (Pet'r
27  Supp. Offer at 72-76, 81, 85-88.)
28                    Kimble's specific allegations state a colorable claim of deficient

1   performance based on trial counsel's failure to subject the prosecution's bodily

2   fluid evidence to independent testing.  Even "applying a heavy measure of

3   deference to counsel's judgments," <u>Strickland</u>, 466 U.S. at 691, the Court cannot

4   conclude on the basis of this record that Mr. Walton's failure to investigate

5   important incriminating evidence was a reasonable professional judgment.  <u>See</u>

6   <u>Jones,</u> 114 F.3d at 1011-12 (attorney's failure to test potentially exculpatory

7   physical evidence was deficient); <u>Baylor v. Estelle,</u> 94 F.3d 1321, 1323-24 (9th Cir.

8   1996) (defense counsel in rape case who failed to pursue lead indicating

9   possibility that defendant's semen did not match that found in victim was

10  deficient); <u>Harris v. Wood,</u> 64 F.3d at 1435-36 (defense counsel in capital murder

11  case who failed to obtain independent evaluation of ballistic evidence and other

12  forensic evidence was deficient); <u>Siripongs,</u> 35 F.3d at 1313 (evidentiary hearing

13  necessary where defense counsel "did not meaningfully pursue or conduct any

14  forensic testing on [evidence of a possible accomplice], and has not offered any

15  explanation for his failure to do so"); <u>see generally</u> <u>Strickland,</u> 466 U.S. at 691

16  ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable

17  decision that makes particular investigations unnecessary."); <u>Turner,</u> 158 F.3d at

18  456 (evidentiary hearing necessary where defense counsel "did not make any

19  effort to investigate the state's case").

20        Even if competent trial counsel would have investigated the physical

21  evidence of rape before trial, however, the failure to do so in this case does not

22  entitle Kimble to relief unless he can show prejudice.  <u>Strickland,</u> 466 U.S. at 691-

23  92.  Despite Kimble's bold assertion that the use of experts would have "enabled

24  trial counsel to present evidence . . . exonerating Petitioner or mitigating

25  Petitioner's culpability," (Pet'r Supp. Offer at 71-72), Kimble offers nothing that

26  casts doubt on the validity of the prosecution's fingerprint evidence, ballistics

27  evidence, or blood stain evidence.  The only area in which independent forensic

28  testing might have made a difference, if Kimble's specific allegations of

60

1  ineffectiveness are proven, is in the identification of the donor of the fluids in

2  Avone Margulies' vagina, and the analysis of her injuries, which the prosecution

3  argued supported the rape charge.

4      The evidence of rape was largely circumstantial.  The prosecutor conceded

5  that the bodily fluid evidence did not exclude Harry Margulies as the potential

6  source of the seminal fluid.  (13 R.T. 3185.)  Both Kimble and Harry Margulies

7  had Type A blood, and no more specific analysis of the blood was performed.

8  Instead, the prosecutor focused on the fact that Avone Margulies was undressed,

9  that her clothes were on the floor of her son's bedroom, that there were minor

10  bruises on her breasts, and on the ages of the Margulies.  Thus, this is not a case in

11  which the prosecution presented compelling physical evidence of rape, and

12  defense counsel neglected to perform tests that would have shown the unreliability

13  of that evidence.  In such a case, prejudice would be manifest.  In contrast, in this

14  case, the potential for prejudice is not as great.  Nevertheless, it is real.  If

15  Kimble's allegations are true, then the jury would have been aware there were

16  significant additional weaknesses in the prosecution's rape case .

17      First, the prosecutor introduced evidence that both Ortez Winfrey and

18  William Grant had Type O blood, and argued on this basis that they "could not be

19  the ones that raped Avone Margulies." (12 R.T. 3157; see also 13 R.T. 3167,

20  3185.)  Yet neither man's status as a secretor was ever established.  If either

21  Winfrey or Grant was a non-secretor, then the fact that his blood type was O did

22  not exclude him as the rapist.  (According to the prosecution expert, approximately

23  one in five people are non-secretors.  (8 R.T. 1996.))  Although the general concept

24  of secretors was introduced, and it was established that Kimble was a secretor, no

25  one ever pointed out to the jury that, for all the evidence showed, Winfrey and

26  Grant might have been non-secretors.

27      Second, Kimble alleges that the vaginal smear yielded so little material for

28  testing that it was impossible to draw any valid conclusions about the blood type

1  of the donor.  Kimble also alleges the prosecution expert's testimony that Avone

2  Margulies had sexual intercourse within six hours of death was unfounded.  If

3  these allegations are true, then the bodily fluid evidence introduced at trial (such

4  as Kimble's blood type) had no relevance to the determination of whether a rape

5  occurred and who might have committed it.  Indeed, if the evidence of sexual

6  intercourse was as weak as Kimble now claims, then it would appear that the only

7  evidence supporting the rape charge consisted of the fact that Avone Margulies

8  was naked and her clothes were in her son's bedroom.

9       Third, under cross-examination by Mr. Walton, the prosecution's criminalist

10  admitted that "all of the blood which [he] typed in connection with this

11  investigation turned out to be Type A," and that "we can do enzymes now,[20]

12  approximately eight different enzyme tests . . . [which] narrow down the

13  population which would have left that bloodstain."  On redirect, the criminalist

14  clarified that enzyme testing is "relatively new compared to A, B, O typing, and

15  it's only recently since . . . in the middle of 1979 did we start routinely doing

16  enzyme typing."  He also testified that at the time he tested the vaginal samples in

17  the Kimble case,[21] "I was not doing enzyme typing, and we really were not set up

18  to do large scale typing of the enzymes in subgroups."  He claimed the samples

19  were now too old for enzyme testing.  (8 R.T. 2000-2002.)

20       Kimble alleges that this testimony was misleading because enzyme-typing

21  has been available since the 1960's, and was available in the Los Angeles Police

22  Department at the time the tests were conducted.  The Serology Case Summary

23  prepared by the criminalist allegedly contains the notation:  "case requested by

24  [investigating officer] Hodel after enzyme typing was doubtful i.e. Booked in

25  August, requested in October."  (Pet'r Supp. Offer at 86:5-16.)  This notation

26

27  [20] "Now" probably meant the year 1980. (See Clerk's Tr. 240 (criminalist Dickinson
       testified November 20, 1980).)

28  [21] The vaginal samples were tested on January 4, 1979.  (8 R.T. 1991-92.)

62

1  seems to indicate that, contrary to the prosecution's evidence, enzyme testing was

2  performed, or at least contemplated in 1978, shortly after the crimes occurred.

3  Moreover, Kimble alleges that if the bodily fluid samples had been properly

4  preserved, they would have lasted five years, and thus could have been subject to

5  enzyme testing at the time of trial.

6          Kimble alleges that Mr. Walton was unable to discredit the prosecution

7  expert's misleading testimony on these subjects because he did not understand that

8  enzyme-testing was relatively common at the time of Kimble's arrest and trial.

9  Had counsel retained an expert, he allegedly would have been able to demonstrate

10 that the police failed to undertake readily available tests that had the potential to

11 differentiate between Kimble and Harry Margulies as the source of the semen.  In

12 a case in which the evidence for rape was weak, and consensual marital sex was a

13 reasonable alternative possibility, this information might have affected the jury's

14 assessment of whether the prosecution had successfully carried its burden of proof

15 on the rape and rape special circumstance allegations.  Cf. Kyles, 514 U.S. at 446

16 n.15 (in some cases, "indications of conscientious police work will enhance [the]

17 probative force [of the State's evidence] and slovenly work will diminish it.");

18 Johnson v. Baldwin, 114 F.3d 835, 838 (9th Cir. 1997) (where state's rape case was

19 weak, defense counsel's failure to investigate evidence that would have lead to

20 alternative defense was prejudicial).

21         The aspect of Claim 10(D) alleging ineffective assistance of counsel in the

22 handling of the forensic evidence relating to the rape charge will be included in

23 the scope of the evidentiary hearing.

24                    **b.     Evidence bearing on involvement of accomplices**

25                Kimble also claims a forensic expert could have explained that

26 alternative scenarios were more consistent with the evidence of the Margulies'

27 injuries and the blood stains in the house than the scenario suggested by the

28 prosecution.  Under these alternative scenarios, it is allegedly more likely that

63

1   more than one intruder was in the house, or that the intruders shot the Margulies in

2   a panic after the alarm was activated.  Specifically, Kimble alleges that a forensic

3   expert would have testified that the abrasions on Harry Margulies' wrists (caused

4   by the handcuffs) could not have resulted in bloodshed.  Hence, the blood seen on

5   the crushed boxes in the closet of the master bedroom could not have come from

6   Harry Margulies.  Kimble argues that this supports a theory that a struggle

7   occurred in the closet, where one of the intruders may have taken Harry Margulies

8   to open the safe in the closet, and that the intruder was injured.  Since Kimble was

9   not injured when he was arrested, the apparent implication of this is that at least

10  one other person participated in the burglary of the Margulies' house.  Kimble also

11  alleges that an expert would have opined that, contrary to the testimony of

12  prosecution witnesses, Avone Margulies was probably not "capable of volitional

13  movement after she was shot."  If so, then she must have been shot in the hallway

14  where she collapsed.  Kimble argues this evidence suggests the Margulies were

15  making their escape from the house after triggering the alarm, when they were shot

16  by the intruders, who panicked when the loud high-pitched horn went off.  Kimble

17  concludes this provides additional support for the defense theory that the killings

18  were not premeditated.  Alternatively, an expert could have explained why,

19  contrary to the prosecution's suggestion, Avone Margulies could not have

20  activated the alarm.  Since her hands were tied behind her back and there was

21  blood all over her back, arms, and hands, she could not have turned the alarm key

22  without getting blood on the wall.  But no blood was found on the wall.  Finally,

23  Kimble claims that forensic evidence could have demonstrated the implausibility

24  of the prosecution's theory that the bullet that pierced Harry Margulies' body was

25  flattened by the handcuffs he was wearing.  This allegedly would have cast doubt

26  on the prosecutor's suggestion that Harry Margulies was probably in a kneeling

27  position when he was shot (on the theory that the bullet entered his chest at a 25

28  degree downward angle and exited near his hands, where it flattened against the

64

1    handcuffs).  (Pet'r Supp. Offer at 77-80, 82-83.)

2            As with the rape evidence, Kimble's allegations state a colorable claim of

3    deficient performance based on counsel's failure to investigate the physical

4    evidence at the crime scene, including his failure to retain forensic experts to

5    guide such an investigation and to assist in combating the conclusions offered by

6    prosecution experts.  If the allegations of the petition are true, then Kimble's trial

7    counsel failed in his duty to subject the prosecution's case to "the crucible of

8    meaningful adversarial testing."  United States v. Cronic, 466 U.S. 648, 656

9    (1984); see, e.g., Jones, 114 F.3d at 1011-12 (attorney's failure to test potentially

10   exculpatory physical evidence was deficient).  Since the defense strategy was to

11   argue that even if Kimble was in the Margulies' house, he was at most a minor

12   accomplice, the defense probably should have independently investigated the

13   crime scene evidence to determine whether it indicated the presence of more than

14   one intruder.  See Siripongs, 35 F.3d at 1313 (evidentiary hearing necessary to

15   determine whether defense counsel was ineffective for failing to pursue leads

16   supporting accomplice defense).

17           Whether Kimble was prejudiced by the foregoing alleged deficiencies is

18   unclear.  Because Kimble was guilty of first degree murder under a felony murder

19   theory, the various alternative interpretations of the evidence concerning the

20   probable sequence of events at the Margulies' house that allegedly should have

21   been presented could not have made a difference to the jury's verdict on the

22   murder charge.  Instead, the question is whether the alleged deficiencies could

23   have affected the jury's verdicts on the rape charge,[22] the special circumstance

24   allegations, and the ultimate decision on penalty.

25

26   _____

27   [22] Kimble offers nothing to suggest that these deficiencies could have affected the verdicts
     on the robbery and burglary charges.  In contrast, if the defense had convinced the jury that
     other intruders probably were present in addition to Kimble, then the rape charge would
28   have been undermined:  If there was an accomplice, then he is as likely to have committed
     the rape as Kimble.

1    Even if the defense had succeeded in undermining the conclusions of the

2    prosecution criminalist and in demonstrating everything the petition alleges could

3    have been shown, the jury still would have known that the Margulies were bound,

4    gagged, and shot in their house.  There was evidence that blood and a bullet were

5    in the den.  There was evidence — albeit only in the form of Bill Margulies'

6    testimony — that crushed and bloody boxes were in the master bedroom closet.

7    The prosecution witnesses testified that the blood in the den formed a trail ending

8    at Avone Margulies' body. The blood on the boxes in the closet was not linked to

9    anyone.  Both bodies were lying in the front hall.

10    If the jurors had accepted what Kimble alleges a competent defense

11    criminalist would have testified to, then they would have reached the following

12    additional conclusions:  (1) if there was blood on the boxes in the closet, it did not

13    come from Harry Margulies; (2) Avone Margulies did not activate the alarm key

14    (so Harry Margulies probably did, before he was shot); (3) Contrary to the

15    prosecution expert's conclusion, Avone Margulies was probably not shot in the

16    den; instead, she was shot in the front hall where she immediately collapsed; (4)

17    Contrary to the prosecution expert's conclusion, the blood in the den did not come

18    from Avone Margulies.  These conclusions imply that the Margulies were shot

19    after the alarm was activated, supporting the defense argument that the Margulies

20    were shot in a panic when the loud, high-pitched horn began to sound.  The

21    presence of another person's blood in the den (or in the closet) would also support

22    the defense argument that Kimble did not act alone.  The prosecutor considered it

23    important to rebut both of these arguments.  (See 13 R.T. 3002, 3145, 3178.)

24    Kimble reasons that if defense counsel had retained a forensic expert and

25    convinced the jurors of the correctness of his interpretation of the evidence, then

26    the jurors would have concluded that there was probably more than one intruder

27    involved, and that the intruders might have shot the Margulies in a panic after the

28    alarm was activated.  While this would not have affected their assessment of

66

1    Kimble's legal guilt, it could have affected their judgment on the ultimate question
2    of whether Kimble deserved to die as punishment for his role in the crimes.

3         The aspect of Claim 10(D) alleging ineffective assistance of counsel with
4    respect to the forensic evidence relating to the reconstruction of the probable
5    sequence of events at the Margulies' residence will be included in the scope of the
6    evidentiary hearing.

7                      **c.    Evidence of prior crimes against the Margulies**

8                      At trial, the defense introduced evidence that in the months
9    prior to the homicides, the Margulies' house was broken into by one or more
10   unidentified black males, and that Patricia Margulies' wallet was stolen from the
11   stereo store by an unknown black male.  After the break-in, the police
12   fingerprinted the Margulies' residence.  The police also collected credit card slips
13   apparently signed by the person who stole the wallet.  Kimble alleges that in order
14   to bolster the defense argument that other people were targeting the Margulies,
15   trial counsel should have employed experts to analyze the credit card slips and the
16   fingerprints, to demonstrate that other people, not Kimble, committed these
17   crimes.

18        There was no suggestion at trial, either by the prosecutor or by any witness,
19   that Kimble was involved in the earlier break-in at the Margulies' residence or in
20   the theft of Patricia Margulies' wallet from the stereo store.  If anything, the
21   evidence indicated that Kimble did not commit those crimes.  Bill Margulies had
22   been in close proximity with the suspected burglar and had seen and spoken with
23   him.  He testified that when he subsequently attended the lineup that included
24   Kimble, he did not recognize any of the lineup participants.  (7 R.T. 1621-23;
25   1633-40.)  Patricia Margulies had seen the person she suspected of stealing her
26   wallet well enough to provide a description to the police; nevertheless she testified
27   she had never seen Kimble before.  (7 R.T. 1748-49, 1746.)  Because there was no
28   reason for the jury even to suspect Kimble of being involved in the prior crimes,

par😀

1   Mr. Walton did not err in failing to present evidence that Kimble did not commit

2   the crimes.  Defense counsel is not required to fend off nonexistent attacks on his

3   client.  Moreover, even if counsel should have presented such evidence, the failure

4   to do so cannot have been prejudicial here, where there was no reason to even

5   suspect Kimble.

6                    **d.      Evidence of Kimble's intoxication**

7                    Kimble also claims that counsel should have conducted tests

8   immediately upon or shortly after Kimble's arrest to provide evidence of Kimble's

9   substance abuse and intoxication at the time of the killings.  But Kimble does not

10  allege that Mr. Grumman was aware, or should have been aware, of any facts that

11  would have lead a reasonable attorney to test Kimble for drug or alcohol

12  intoxication.  Kimble was arrested four days after the crimes occurred.  Although

13  the petition alleges that Kimble was also under the influence of intoxicants during

14  his post-arrest interrogation, there is no allegation that Kimble was intoxicated

15  when he spoke with defense counsel, and no allegation that Kimble told counsel

16  he was intoxicated.  This aspect of Claim 10 therefore fails to state a colorable

17  claim of deficient performance.  See United States v. Grewal, 825 F.2d 220, 222-

18  23 (9th Cir. 1987); cf. McDowell v. Calderon, 107 F.3d 1351, 1356-57 (9th Cir.)

19  (no deficiency where counsel conducted drug and alcohol tests shortly after

20  defendant told counsel he was intoxicated at time of crime), amended, 116 F.3d

21  364 (9th Cir.), vacated in part on other grounds, 130 F.3d 833 (9th Cir. 1997) (en

22  banc).

23    **B.      Claim 10(C):  Inadequate Voir Dire**

24                    Kimble alleges that Mr. Walton conducted an inadequate voir dire of the

25  jurors, and thereby failed to ensure they were free of racial prejudice, and were not

26  predisposed to impose the death penalty.  He also complains that Mr. Walton's

27  failure to request that the jurors be sequestered caused them to be exposed to

28  inflammatory publicity.  This portion of Kimble's ineffectiveness claim

1  incorporates the allegations of Claim 36, which directly challenges the fairness of

2  the jury on a variety of grounds.  Kimble does not seek an evidentiary hearing on

3  Claim 36, which presumably can be resolved on the basis of the record, and has

4  not supplemented these allegations in his offer of proof.

5       It is unnecessary to hold an evidentiary hearing in order to assess whether

6  Kimble was prejudiced by any of these alleged deficiencies.  Kimble points to no

7  evidence bearing on prejudice.[23]  Nevertheless, Mr. Walton's testimony about why

8  he did not question the jurors about their racial attitudes or their views of the death

9  penalty might help to resolve the performance prong of this claim.  See, e.g.,

10  Harris, 64 F.3d at 1436.  For this reason, Kimble will be permitted to present

11  evidence in support of his claim that defense counsel was deficient in his voir dire

12  regarding jurors' racial attitudes and views of the death penalty.  The hearing on

13  this aspect of Claim 10(C) will be limited to the performance prong of the

14  Strickland test.

15       The remaining aspects of Claim 10(C) do not require a hearing.  Kimble

16  does not argue the jurors should have been sequestered to prevent exposure to

17  publicity about the Kimble case itself, but simply because "there was widespread

18  publicity about *murders in Petitioner's neighborhood*" during the trial.  (2d Am.

19  Pet. at 45 (emphasis added).)  Despite having interviewed some of the jurors about

20  other aspects of their deliberations, (see Pet'r Supp. Offer at 120-27), Kimble does

21  not allege that any jurors were actually exposed to such publicity or influenced by

22  it.  Thus, even assuming it was deficient for defense counsel not to request

23  sequestration under these circumstances, Kimble cannot demonstrate prejudice.[24]

24  _____

25  [23] When the Court addresses Claim 36, in which Kimble identifies the specific jurors who allegedly should have been excused for cause, the Court will decide on the basis of the

26  record whether any jurors gave responses indicating an inability to impartially assess the penalty.

27

28  [24] The remainder of Claim 10(C) consists of one-sentence allegations that are too vague to warrant habeas relief: "Trial counsel prejudiced one juror by indicating to her that Petitioner had been on trial in a highly prejudicial matter," "unreasonably failed to object

### C.   Claim 10(F):  Errors in Raising Objections

Kimble broadly alleges that defense counsel failed to adequately attack prosecution witnesses and other evidence, failed to object to introduction of an inadmissible probation report at the automatic motion to modify the death verdict, and failed to object to prosecutorial misconduct.  Moreover, Kimble claims, defense counsel unreasonably objected to evidence and proposed jury instructions that would have benefitted Kimble.  The petition does not describe these alleged failings with any specificity, but instead incorporates by reference eighteen out of the other thirty-five claims in the petition.  Petitioner's offer of proof adds nothing to these vague allegations.  Since this claim is unsupported by a statement of specific facts, it does not warrant habeas relief.  <u>Blackledge</u>, 431 U.S. at 75 n.7; <u>James v. Borg</u>, 24 F.3d at 26.

### D.   Claim 10(G):  Not Permitting Kimble to Testify at Penalty Phase

Kimble alleges that Mr. Walton was deficient for not allowing him to testify in his own defense at the penalty phase.  At trial, Mr. Walton told the judge he was considering calling Kimble to the stand, but expressed concern about potential rebuttal evidence that the prosecution might offer.  He asked the prosecutor to reveal whether he intended to present additional evidence in aggravation if Kimble testified.[25]  The prosecutor refused to answer, but did say that his investigator was prepared "to investigate some possible witnesses as to acts of force and violence [by Kimble] . . . ."  Defense counsel then rested. (13 R.T. 3334-35.)

Kimble claims that Mr. Walton was uncertain whether to proceed because he had failed to investigate Kimble's record, and so had no idea whether there was

---

to the prosecutor's discriminatory use of peremptory challenges against cognizable groups," and "unreasonably failed to move to reopen voir dire of the jury panel when one sworn juror was discharged while the alternate jurors were being selected." (2d Am. Pet. at 45.)

[25] The prosecutor was not required to give advance notice of such evidence.  Former Cal. Penal Code § 190.3 ¶ 4.

1    significant additional evidence in aggravation that the prosecutor might deploy.  If
2    Mr. Walton had conducted an adequate investigation, he allegedly would have
3    discovered that the only potential act of force or violence that the prosecution
4    could have introduced in rebuttal was a high school incident in which Kimble hit a
5    fellow student who had thrown a ball at him in the hallway.[26]

6            These allegations state a colorable claim of deficient performance.
7    Reasonable counsel in a capital sentencing proceeding would be familiar enough
8    with the client's record to be able to make an informed judgment about whether to
9    allow the client to testify, instead of reacting in ignorance and haste to an
10   unsubstantiated threat by the prosecution.  See Hart v. Gomez, 174 F.3d 1067,
11   1070-71 (9th Cir. 1999) (competent counsel would recognize importance of
12   independently corroborating facts underlying capital defendant's criminal history);
13   Siripongs, 35 F.3d at 1316 ("Few aspects of representation can be more critical
14   than understanding the client's criminal history.").

15           Kimble fails to explain, however, how he was prejudiced by Mr. Walton's
16   uninformed decision.  He does not describe, even in outline form, the substance of
17   the testimony he would have provided, had he been called to the stand.  See
18   United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987) (prejudice from
19   attorney's failure to call witnesses not shown where appellant does not describe
20   witnesses' testimony); see also Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir.
21   1997) (petitioner fails to show prejudice from denial of continuance that allegedly
22   prevented him from presenting witnesses if he does not describe "what the witness
23   would have testified to at trial.").  Since the petition fails to allege facts that, if
24   proved, would demonstrate ineffective assistance of counsel in this regard, Claim
25   10(G) must be denied.

26

27

28   _____
     [26]  Under former Cal. Penal Code § 190.3(b), a defendant's prior criminal activity was an
     aggravating factor only if it "involved the use or attempted use of force or violence . . . ."

E.    **Claim 10(H):  Errors in Raising Objections to Penalty Phase Instructions**

Kimble alleges that Mr. Walton erred with respect to the jury instructions, so that the jurors were not told the elements of the special circumstance allegations, and were provided with insufficient guidance in exercising their discretion at the penalty phase.  This claim incorporates all the allegations of Claims 1, 7, 11-14, 17-29, 31, 32, 34, and 35.  Kimble complains both that Mr. Walton failed to object to erroneous instructions, and that he also mistakenly objected to instructions that would have benefitted the defense.

In contrast to the vaguely worded Claim 10(F), the petition lists twelve separate instances of allegedly deficient performance in support of Claim 10(H). Ten of these instances (Nos. 1-9 & 12) are allegations that defense counsel unreasonably failed to request certain jury instructions.[27]  No evidentiary hearing is necessary on these allegations.  If Kimble was entitled to an instruction upon request, and if the instruction could have benefitted Kimble, then it was probably deficient for Mr. Walton not to request the instruction.  These questions can be resolved on the basis of the record and the applicable law; they require no factual development.  The Court can also assess prejudice on the basis of the record.

Two of Kimble's allegations (Nos. 10 & 11) are of a different character:  he faults Mr. Walton for objecting to certain allegedly beneficial instructions that the trial court was prepared to give.  After responding to the jury's questions during the penalty deliberations, which indicated some difficulty in reaching a verdict, the judge asked counsel whether he should reread "the instruction as to the duty of the jurors to talk to each other and form their own opinions."  Mr. Walton objected, so the instruction was not given.  Instead, the judge told the jurors, "Your duty is not to follow your personal choice, but you are to follow what the law states that you

---

[27] *E.g.,* trial counsel should have requested an instruction at the penalty phase that the jury could consider mercy or sympathy in reaching its decision.

72

1    must do . . . ." (13 R.T. 3400-3401.)  Kimble alleges it was a mistake to object to

2    the instruction, and as a result, the jurors were led to believe that they "should

3    reach a consensus rather than tally their individual opinions."  Kimble also faults

4    Mr. Walton for objecting to standard pattern instructions not to speculate about

5    why the defendant did not testify.  (See 2d Am. Pet. at 58:10-21 (Claim 10(H)(10)

6    & (11)).)  Although the prejudicial effect, if any, of these objections can be

7    assessed by examining the record, it might be helpful to hear Mr. Walton's

8    testimony about his reasons for making these objections in evaluating whether he

9    was deficient.  The Court will therefore include the deficiency prong of Claim

10   10(H)(10) & 10(H)(11) in the evidentiary hearing.

11          **F.     Claim 10(I):  Inadequate Penalty Phase Argument**

12          Kimble alleges that Mr. Walton's closing argument at the penalty phase was

13   inadequate.  He faults Mr. Walton for not correcting the prosecutor's misstatement

14   of law regarding aggravating and mitigating evidence, and more generally, for

15   electing "to emphasize the horrors of execution to jurors chosen in part because of

16   their belief in the death penalty . . ." instead of attempting to "individualize

17   Petitioner as a human being." (2d Am. Pet. at 59.)

18          Although the effectiveness of counsel's argument can be assessed by

19   reading the trial transcript, it might facilitate the resolution of the deficiency prong

20   of this claim to hear Mr. Walton's explanation of his strategy.  The deficiency

21   prong of Claim 10(I) will therefore be included in the hearing.

22          **G.     Claim 10(J):  Preparation for Probation Report**

23          Kimble alleges Mr. Walton failed to assist Kimble with regard to his

24   meeting with the probation officer who prepared the probation report on which the

25   trial court relied in denying Kimble's motion to modify the sentence.  Counsel

26   allegedly failed to prepare Kimble for the interview, failed to provide mitigating

27   evidence, and failed to object to inadmissible evidence included in the report.

28   This claim is related to Claims 15 and 16, which directly allege that the trial

1    court's reliance on a flawed probation report rendered its sentencing decision

2    unconstitutional.

3         Kimble does not seek an evidentiary hearing on Claims 15 and 16, and

4    identifies no additional factual allegations in support of Claim 10(J) in his offer of

5    proof.  The claim requires no factual development.  It stands or falls with Claim

6    15.  If Kimble is entitled to relief on the basis of Claim 15, then Claim 10(J) is

7    superfluous.  Conversely, if Kimble is not entitled to relief on the basis of Claim

8    15, then it follows that the deficiencies alleged in Claim 10(J) were not prejudicial.

9    It is therefore unnecessary to hold an evidentiary hearing on this claim.

10   **VII.   Brady Claims**

11        In Claim 6, Kimble alleges that the prosecution withheld evidence that

12   would have materially benefitted the defense.  First, in Claim 6(B), Kimble claims

13   the prosecution withheld impeachment evidence concerning Ortez Winfrey:  (1) a

14   witness, Gordon Cheatham, told the police he was with Winfrey and Kimble on

15   the night of the stereo store burglary, at a time that conflicted with Winfrey's

16   account of the evening; and (2) Winfrey was arrested twice for other crimes during

17   the two-year period between Kimble's arrest and trial, but was never prosecuted.

18        Second, in Claim 6(C), Kimble claims the prosecution failed to disclose two

19   facts about witness Mildred Shane:  (1) she saw the two black men driving the car

20   down Doheny Drive on the afternoon of the murders stop to pick up the black man

21   who ran down Nightingale Drive; and (2) when law enforcement officers escorted

22   Ms. Shane to the courthouse to testify, they told her that the prosecution was

23   seeking the death penalty because otherwise Kimble, who they told her was the

24   murderer, would be out of prison in seven years, an assertion that terrified Ms.

25   Shane.

26        **A.    Legal Standard for Brady Claims**

27        In a criminal prosecution, the state must "disclose evidence favorable to the

28   accused that, if suppressed, would deprive the defendant of a fair trial."  United

1   States v. Bagley, 473 U.S. 667, 675 (1985); Brady v. Maryland, 373 U.S. 83

2   (1963). This includes an obligation to disclose evidence that could be used to

3   impeach a government witness. Bagley, 473 U.S. at 676. The duty to disclose

4   exculpatory evidence exists regardless of whether the defendant specifically

5   requests it. See id. at 682; Kyles, 514 U.S. at 433; Carriger, 132 F.3d at 480.

6        The failure to disclose evidence deprives the defendant of a fair trial, and

7   hence warrants relief on federal habeas review, only if the evidence is material,

8   i.e., "if there is a reasonable probability that, had the evidence been disclosed to

9   the defense, the result of the proceeding would have been different." Kyles, 514

10  U.S. at 433-34 (citation and internal quotation marks omitted). To establish

11  materiality, Kimble need not demonstrate that if the evidence had been disclosed

12  to the defense, he probably would have received a different verdict. Id. at 434.

13  Instead, as with Strickland claims, the question is whether in the absence of the

14  undisclosed evidence, Kimble "received a fair trial, understood as a trial resulting

15  in a verdict worthy of confidence." Id. A "reasonable probability" of a different

16  result is shown "when the government's evidentiary suppression 'undermines

17  confidence in the outcome of the trial.'" Id. (quoting Bagley, 473 U.S. at 678).

18       The requirement to disclose material exculpatory evidence imposes a duty

19  on prosecutors "to learn of any favorable evidence known to others acting on the

20  government's behalf in the case, including the police." Id. at 437; Giglio v.

21  United States, 405 U.S. 150, 154 (1972). A promise made by one government

22  agent to a witness in a criminal prosecution must be attributed to the government

23  as a whole. Giglio, 405 U.S. at 154. Thus, if Winfrey was assured of lenient

24  treatment in exchange for his testimony against Kimble, the prosecutor had a duty

25  to find this out and disclose it to the defense. Id.; accord Kyles, 514 U.S. at 437.

26       **B.    Evidence Concerning Ortez Winfrey**

27            **1.    Gordon Cheatham's Statement**

28                 Kimble alleges the prosecution failed to disclose that Gordon

75

1    Cheatham told the police he was smoking marijuana with Winfrey, Kimble, and

2    others at the playground of a local school at approximately 7:30 p.m. on the

3    evening of the murders.  Kimble argues Mr. Cheatham's statement would have

4    impeached Winfrey's testimony that Kimble came to Winfrey's house around 6:00

5    p.m. and they subsequently drove to the stereo store and burglarized it.

6          The proffered evidence is not material, because it is consistent with the

7    other evidence of Winfrey's and Kimble's movements on the night of the crimes.

8    Winfrey's testimony about the timing of his and Kimble's visits to various houses

9    and their three separate trips to the stereo store on the evening of the burglary was

10   vague and uncertain.  Winfrey initially testified that Kimble came by his house

11   around 6:00 p.m.  (9 R.T. 2164.)  They subsequently drove to the stereo store,

12   checked that the keys opened the door, and ate dinner at a Taco Bell across the

13   street.  Winfrey thought they stayed at the Taco Bell "[a]bout an hour."  After

14   dinner, they returned to Winfrey's house "for a little while," and drove back to the

15   stereo store "[a]round 7:00, 6:00 [p.m.]."  (9 R.T. 2171.)  After taking equipment

16   from the store and unloading it at their houses, they returned to the store with

17   William Grant "around 10:00 or 11:00 [p.m.]."  (9 R.T. 2193.)  On cross-

18   examination, Winfrey admitted he had initially told the police Kimble arrived at

19   his house "[a]bout 4:00 o'clock."  (9 R.T. 2293-94.)  The jury also knew that the

20   stereo store alarm was triggered around 8:00 p.m., and again around 11:00 p.m.  (8

21   R.T. 1873-76, 1974-76.)

22         If Mr. Cheatham's statement is accurate, then Winfrey and Kimble probably

23   smoked marijuana with the others "at approximately 7:30 p.m.," around the time

24   they returned to Winfrey's house after eating dinner.  The jurors knew that

25   Winfrey told the police Kimble appeared at his house around 4:00 p.m., but at trial

26   testified he arrived around 6:00 p.m.  They knew too that Winfrey's trial testimony

27   about the timing of events was uncertain:  On separate occasions, he said both the

28   first and second visits to the stereo store might have occurred around 6:00 p.m.,

76

1  even though he estimated they were at least an hour apart.  (See 9 R.T. 2164,

2  2171.)  And he offered an alternative estimate of 7:00 p.m. for the second visit,

3  although the alarm evidence indicated it was closer to 8:00 p.m.  (See 9 R.T. 2171,

4  8 R.T. 1873-76.)  Under these circumstances, Mr. Cheatham's testimony would

5  not have made a difference in the jurors' assessment of Winfrey's credibility; nor

6  would it have influenced their ultimate conclusions about the probable sequence

7  of events during the day of the murders and the evening of the stereo store

8  burglary.

9            2.      Winfrey's Additional Arrests

10           Kimble alleges that Winfrey was arrested twice for other crimes he

11  committed during the two-year period following his and Kimble's arrest and

12  before trial, but was never prosecuted for these crimes.  One of the crimes

13  allegedly was a felony (grand theft of an automobile); the petition provides no

14  details on the other crime.  The jury was not informed of these benefits, which

15  allegedly were conferred on Winfrey in exchange for his testimony against

16  Kimble.  Since the evidence strongly implicated Winfrey's involvement, and

17  probable leadership role, in the stereo store burglary (and, perhaps, the murder as

18  well), Kimble argues, evidence impeaching Winfrey's credibility was crucial to his

19  case.

20           At trial, the jury was told that Winfrey had been charged with second degree

21  burglary for his role in the stereo store burglary, but that the charges would be

22  dismissed in exchange for his testimony against Kimble.  (9 R.T. 2237-38.)  They

23  were not told of any other benefits.  Respondent denies that any undisclosed

24  benefits were conferred on Winfrey.

25           Without a more detailed description of the alleged undisclosed benefits, it is

26  impossible to assess their materiality.  Because questions about the involvement of

27  accomplices in the crimes are relevant to the ineffective assistance of counsel

28  claim, the aspect of Claim 6(B) relating to benefits conferred on Ortez Winfrey

1  will be included in the scope of the hearing. Kimble has requested leave to

2  conduct discovery related to this claim. As described below, the parties should

3  attempt to reach agreement on discovery to facilitate resolution of this claim.

4      **C.**    **Evidence Concerning Mildred Shane**

5         As discussed above in connection with Kimble's ineffective assistance of

6  counsel claim, evidence that the young black man who Ms. Shane saw running

7  down Nightingale Drive at 1:30 p.m. on the afternoon of the murders was given a

8  ride by two other young black men would have supported the defense argument

9  that the crimes were not committed by a single person acting alone. For this

10  reason, an evidentiary hearing will be held on Claim 10(B). The related

11  allegations of Claim 6(C) regarding the interactions between law enforcement

12  officers and Ms. Shane will also be included in the hearing.

13  **VIII. Prosecutorial Misconduct Claims**

14         Claim 7 consists of eleven separate subclaims (labeled A-K), alleging that

15  various acts committed by the police or the prosecutor deprived Kimble of a fair

16  trial. Some of these claims are record-based: Parts E, F, G, H, and J allege that

17  the prosecutor engaged in prejudicial misconduct in his closing arguments at the

18  guilt and the penalty phase by misrepresenting the evidence, misleading the jury

19  about Ortez Winfrey's credibility, invoking unconstitutional considerations such

20  as race, asking the jury to return duplicative special circumstance findings and

21  other sentencing enhancements, and generally misleading the jury about its role in

22  determining Kimble's sentence. Kimble has identified no evidence outside the

23  record relevant to these claims. Because they can be resolved on the basis of the

24  record, no evidentiary hearing is required for these aspects of Claim 7.

25      **A.**    **Claim 7(A): Jurors Saw Kimble in Jail Clothes**

26         Kimble alleges that law enforcement officers forced him to appear before

27  the jury in jail clothes during the initial portion of jury voir dire, by refusing to

28  allow Kimble's family to bring him clothes while he was housed at the Los

1    Angeles County Jail.  Members of Kimble's jury were among the group of

2    prospective jurors who saw him in jail clothes.  Kimble seeks an evidentiary

3    hearing on this claim in order to prove that the clothes he wore were readily

4    identifiable to jurors as jail clothes, and jail personnel repeatedly rebuffed his

5    family's attempts to bring him civilian clothes.[28]

6         It is a violation of due process and the presumption of innocence to compel

7    a defendant to appear before the jury in identifiable jail clothes.  Estelle v.

8    Williams, 425 U.S. 501 (1976); Felts v. Estelle, 875 F.2d 785 (9th Cir. 1989).

9    Nevertheless, because "[a] defendant, as a trial tactic, may choose to dress in jail

10   clothes," a defendant must prove that he was compelled to wear identifiable jail

11   clothes in order to establish a violation of due process.  Felts, 825 F.2d at 786

12   (citing Williams, 425 U.S. at 508.)  It is the element of compulsion that violates

13   the Constitution, not the appearance in jail clothes per se.  See Williams, 425 U.S.

14   at 512-13; Felts, 875 F.2d at 786.  For this reason, to prevail on a claim of

15   constitutional error, a defendant must object when he is forced to appear before the

16   jury in jail clothes.  "[T]he failure to make an objection to the court as to being

17   tried in [identifiable prison clothes], for whatever reason, is sufficient to negate the

18   presence of compulsion necessary to establish a constitutional violation."

19   Williams, 425 U.S. at 512-13.

20        To prevail on such a claim, "[t]he accused must make a record before the

21   trial court that the accused's clothing would be identifiable to the jury as prison

22   garments."  United States v. Rogers, 769 F.2d 1418, 1423 (9th Cir. 1985).

23   Although respondent complains that the petition fails to explicitly allege the jail

24   clothes Kimble wore were identifiable as such, the petition can fairly be taken to

25   imply that the jurors saw Kimble in clothes revealing his custodial status.  The

26   record shows the trial judge was aware, even before Kimble first appeared before

27

28   [28] This subclaim incorporates Claim 35, on which Kimble does not seek an evidentiary
     hearing.

1   the jurors, that the clothes Kimble was wearing were jail clothes.  Prior to voir

2   dire, the trial court granted a continuance to allow Kimble to obtain civilian

3   clothes, asking, "Mr. Kimble, [do you] waive time one day so you can have

4   courtroom clothes?"  Kimble agreed and the trial was continued.  (1 R.T. A65

5   (Proceedings of Sept. 22, 1980).)  If the judge saw that Kimble was dressed in jail

6   clothes, then the jurors probably did too.

7         Even assuming the jurors saw Kimble dressed in identifiable jail clothes,

8   however, he is not entitled to relief because he did not object.  About three weeks

9   after the trial court granted a continuance for Kimble to obtain civilian clothes, on

10  October 14, 1980, Kimble first appeared before a panel of prospective jurors for

11  the start of voir dire.  He was still dressed in jail clothes.  Mr. Walton voiced no

12  objection, however.  On the afternoon of October 15, 1980, after the end of the

13  second day of voir dire, with Kimble still in jail clothes, Mr. Walton made the

14  following statement:

15
16            Three different times in the last two or three weeks the
         defendant's mother has tried to bring him clothes out of the jail
17       [sic], and for one reason or another has not been able to leave
         them.

18            Now, my understanding is that recently, or some months
         ago, the jail changed its regulations so that you could only
19       bring clothing on particular days of the week, Mondays or
         Tuesdays.

20
              Is that what you understand, Eric?  [Kimble answered,
21       "Yes."]

22            We have entailed [sic] the matter one day in Department 26
         so she can bring clothes up that afternoon, and she was
23       rebuffed.

24            I was kind of surprised to see him walk out yesterday in jail
         blues with all the jurors sitting here because I knew there was
25       going to be an effort made to get him clothing last Friday.  But
         apparently she was not able to do it.

26
27  (2 R.T. 297.)  The judge then discussed the problem with the bailiff and Mr.

28  Walton, and ordered the sheriff to receive clothing for Kimble.  (2 R.T. 298-302.)

1 From this point on, Kimble wore civilian clothes at trial.

2      The judge's colloquy with Kimble in which he granted a continuance to

3 allow him to obtain civilian clothes shows it is unlikely Kimble deliberately chose

4 to appear before the jury panel in jail clothes.  Nevertheless, neither Kimble nor

5 his attorney said anything on the first day of voir dire, when Kimble appeared in

6 jail clothes.  The failure to make an objection at that time "negate[s] the presence

7 of compulsion necessary to establish a constitutional violation." <u>Williams</u>, 425

8 U.S. at 512-13.  Kimble's prior expression of a desire to wear civilian clothes did

9 not constitute a sufficient objection to appearing in jail clothes three weeks later

10 on the first day of voir dire. <u>Rogers</u>, 769 F.2d at 1420-23 (insufficient objection

11 where defendant requested delay in proceedings to obtain civilian clothes, but

12 when this request was denied, "acquiesced to the court's suggestion that the trial

13 should proceed but that the prisoner could change during the noon recess.").

14 <u>Rogers</u> shows that a defendant must not merely express a strong preference for

15 wearing civilian clothes, but must voice a clear objection to appearing before the

16 jury in jail clothes.  For this reason, both Claim 7(A) and Claim 35 must be denied.

17      **B.**    **Claim 7(B):  Officers Chastised Kimble Before Jury**

18      Kimble alleges: "Law enforcement officers improperly chastised Petitioner

19 in the presence of members of the jury." (2d Am. Pet. at 25.)  This single sentence

20 is the entirety of Kimble's statement of this claim.  Without a description of what

21 the jurors were exposed to, this allegation does not state a claim for relief and does

22 not warrant a hearing. <u>James</u>, 24 F.3d at 26; <u>Campbell</u>, 18 F.3d at 679.  Claim

23 7(B) must therefore be denied.

24      **C.**    **Claim 7(C):  Witness Intimidation**

25      Kimble alleges that because "[l]aw enforcement officers intimidated or

26 coerced witnesses who had evidence favorable to the defense, . . . witnesses did

27 not provide favorable testimony for the defense" about the participation of

28 accomplices in the crimes. (2d Am. Pet. at 25-26.)  The "favorable testimony"

1   referred to in this claim is the same as that alleged in Kimble's <u>Brady</u> claim (Claim

2   6), *i.e.,* Mildred Shane's testimony that she saw the running man get into a car, and

3   Gordon Cheatham's testimony that he smoked marijuana with Winfrey and

4   Kimble in the early evening on the day of the crimes.

5        For the reasons previously explained, Mr. Cheatham's testimony was not

6   material.  However, because the allegations regarding Mildred Shane are related to

7   the <u>Brady</u> and ineffective assistance of counsel claims on which an evidentiary

8   hearing will be held, the Court will include this aspect of Claim 7(C) in the

9   hearing.

10       **D.    Claim 7(D):  Failure to Preserve Forensic Evidence**

11       Kimble alleges that the prosecution failed to preserve the bodily fluid

12  evidence taken from Avone Margulies and from the various males who might have

13  deposited the seminal fluid in her vagina.  However, he does not claim to be able

14  to show that the unpreserved forensic evidence, if tested, would have exonerated

15  him.  The United States Supreme Court has held that "the failure of the State to

16  preserve evidentiary material of which no more can be said than that it could have

17  been subjected to tests, the results of which might have exonerated the defendant"

18  does not constitute a due process violation, absent a showing of bad faith on the

19  part of the prosecution.  <u>Arizona v. Youngblood</u>, 488 U.S. 51, 57-58 (1988);

20  <u>accord</u> <u>United States v. Hernandez</u>, 109 F.3d 1450, 1455 (9th Cir. 1997) (per

21  curiam).  Kimble does not claim the police were acting in bad faith when they

22  failed to preserve the semen evidence.  Nor does he cite evidence that would raise

23  such an inference.  <u>Cf.</u> <u>Miller v. Vasquez</u>, 868 F.2d 1116, 1120-21 (9th Cir. 1989).

24  This claim must therefore be denied.

25       **E.    Claim 7(I):  Refusal to Disclose Impeachment Evidence**

26       As previously described, at the close of the defense portion of the penalty

27  phase, outside of the presence of the jury, Mr. Walton stated that he was

28  considering calling Kimble to the stand, but first wanted to know whether the

82

1  prosecution planned to present aggravating evidence in rebuttal if Kimble

2  testified. Mr. Walton conceded that the governing California statute specifically

3  exempted rebuttal evidence from the notice requirement that otherwise applies to

4  aggravating evidence at the penalty phase; nevertheless, he asked the prosecutor to

5  disclose his intentions in "the spirit of the [statute]." The prosecutor refused to

6  say, but indicated he was in the process of investigating "some possible witnesses

7  as to acts of force and violence that I was not aware of until 1:30 this afternoon."

8  Mr. Walton then rested without calling Kimble to the stand. (13 R.T. 3334-34).[29]

9         In Claim 7(I), Kimble contends the prosecutor acted improperly when he

10  refused to disclose what information he might use to rebut Kimble's testimony, if

11  Kimble chose to testify. Kimble argues the prosecutor had a duty to disclose this

12  evidence, so that he could make an intelligent decision about whether to testify in

13  his own defense.

14         Under California law, Kimble had no right to receive advance notice of

15  potential rebuttal evidence. Former Cal. Penal Code § 190.3 ¶ 4. The question in

16  this habeas proceeding, however, is whether the failure to provide Kimble with

17  advance notice violated his right to a fair sentencing proceeding under the United

18  States Constitution. Although Kimble cites no authority for his claim, he appears

19  to be arguing that a capital defendant has a right to pretrial discovery of all

20  evidence the prosecution anticipates introducing at the penalty phase. But the

21  Constitution does not guarantee criminal defendants a right to pretrial discovery of

22  government witnesses:

23              It does not follow from the prohibition against concealing
24         evidence favorable to the accused that the prosecution must
           reveal before trial the names of all witnesses who will testify
25         unfavorably. There is no general constitutional right to
           discovery in a criminal case, and Brady did not create one; as
26

27  _____

28  [29] Claim 10(G), discussed above, presents a related claim of ineffective assistance of
    counsel based on Mr. Walton's apparent lack of preparedness for this stage of the
    proceedings.

the Court wrote recently, "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded. . . ." <u>Wardius v. Oregon</u>, 412 U.S. 470, 474 (1973).

<u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977); <u>see also</u> <u>Gray v. Netherland</u>, 518 U.S. 152, 166-68 (1996) (since prior case law does not support capital habeas petitioner's claim that he was entitled to advance notice of aggravating evidence, such a claim is barred by the anti-retroactivity doctrine of <u>Teague v. Lane</u>, 489 U.S. 288 (1989)); <u>Turner v. Calderon</u>, 281 F.3d 851, 867-68 (9th Cir. 2002) (denying application for certificate of appealability on similar claim).

Moreover, as explained above in connection with Claim 10(G), Kimble fails to explain how the penalty phase would have been different had he testified, since he has not offered the substance of his testimony. Without showing that his failure to testify had a "substantial and injurious effect or influence" on the penalty verdict, Kimble is not entitled to relief. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637-38 (1993) (citation and internal quotation marks omitted). Claim 7(I) must therefore be denied.

### F.     Claim 7(K): Denial of Telephone Privileges

Kimble claims jail personnel interfered with his defense by refusing to permit him to place telephone calls from jail, even though the trial court authorized telephone privileges on several occasions.

The record reveals that on several occasions before trial, in response to Kimble's requests, the trial court ordered jail personnel to permit Kimble to place telephone calls. On December 8, 1978, the court authorized two calls. (1 R.T. A12.) On April 23, 1979, the court authorized two more calls. (1 R.T. A31.) On September 24, 1979, the court authorized six more calls. (1 R.T. A42-A43.) On March 25, 1980, the court ordered the jail to allow Kimble to make two calls each week until June 3, 1980. (1 R.T. A52.) Up to this point in time, Kimble never told the court that he had been prevented from making any of the authorized

1   telephone calls.  When Kimble returned to court on June 3, 1980, however, he

2   informed the court that Sheriff's deputies said "they could not honor that kind of

3   continuing order" for telephone calls, and therefore did not allow him to place any

4   of the calls the court had authorized in March 1980.  (1 R.T. A53.)  The court

5   immediately authorized four more telephone calls, and offered to authorize more

6   in "a couple of weeks" on an *ex parte* basis if Kimble needed them.  (1 R.T. A54.)

7   Kimble returned to court again on July 21, 1980, but said nothing about telephone

8   calls. (1 R.T. A55-A56.)  Kimble next appeared in court on July 24, 1980, did not

9   indicate any problem with telephone access, and requested four more calls, which

10   the court granted.  (1 R.T. A61.)  Kimble appeared in court on seven more

11   occasions before the trial began on October 9, 1980, but never expressed a need

12   for additional telephone calls.  (1 R.T. A62-A71.)

13       Although Kimble does not specify when jail personnel prevented him from

14   placing telephone calls, it appears from the foregoing record that Kimble may have

15   been denied telephone access from March 25, 1980, through June 3, 1980, during

16   the period that jail personnel refused to honor the trial court's "continuing order"

17   for two calls per week.  (See 1 R.T. A53.)

18       The government's refusal to allow an incarcerated defendant to

19   communicate with the outside world by telephone can deprive the defendant of

20   due process if it prevents him from preparing a defense.  Milton v. Morris, 767

21   F.2d 1443, 1446-47 (9th Cir. 1985).  However, there is no authority for the

22   proposition that when a defendant is represented by counsel and is able to

23   communicate effectively with that counsel to prepare a defense, the defendant

24   must also be given access to a telephone.  To the contrary, the cases imply that

25   access to counsel is all that is required.  See United States v. Robinson, 913 F.2d

26   712, 717 (9th Cir. 1990); United States v. Wilson, 690 F.2d 1267, 1272 (9th Cir.

27   1982); cf. Milton, 767 F.2d at 1446-47 (pro se defendant who was denied use of

28   telephone "had no means to prepare a defense").

85

1    Kimble cursorily alleges that jail personnel "interfered with [his] defense,"

2   by preventing him from placing telephone calls, but he does not explain how he

3   was prejudiced at trial.  Kimble alleges no facts that would support a claim that his

4   temporary inability to use the telephone "denied him access to his lawyer or

5   prejudiced his access to the courts." Keenan v. Hall, 83 F.3d 1083, 1093 (9th Cir.

6   1996).  Without a showing of prejudice from the denial of telephone privileges,

7   this claim fails.  United States v. Lucas, 873 F.2d 1279, 1280-81 (9th Cir. 1989).

8   **IX.   Juror Misconduct Claims**

9    In Claim 14, Kimble alleges that several jurors committed misconduct that

10   deprived him of a fair trial.  This claim consists of eight separate subclaims,

11   labeled A-H.

12    **A.   Claims About the Jury's Deliberative Process**

13    Several portions of Claim 14 assert that during their deliberations, jurors

14   disregarded their instructions and permitted inappropriate considerations to

15   influence their verdicts.  Because these allegations are based on inadmissible

16   evidence, however, they cannot form a basis for habeas relief.

17    The Federal Rules of Evidence apply to this habeas corpus proceeding.  Fed.

18   R. Evid. 1101(e).  "Federal Rule of Evidence 606(b) is grounded in the common-

19   law rule against admission of jury testimony to impeach a verdict and the

20   exception for juror testimony relating to extraneous influences." Tanner v. United

21   States, 483 U.S. 107, 121 (1987).  The rule prohibits jurors from testifying about

22   any matter or statement occurring,

23
24    during the course of the jury's deliberations or to the effect of
        anything upon that or any other juror's mind or emotions as
        influencing the juror to assent to or dissent from the verdict . . .
25    or concerning the juror's mental processes in connection
        therewith, except that a juror may testify on the question
26    whether extraneous prejudicial information was improperly
        brought to the jury's attention or whether any outside influence
27    was improperly brought to bear upon any juror.

28   Fed. R. Evid. 606(b).

1    In assessing Kimble's allegations based on the jurors' penalty deliberations,
2    the Court must apply Rule 606(b) to determine whether there is admissible
3    evidence that could properly be used to impeach the jury's verdict. McDowell,
4    107 F.3d at 1367. Under the rule, jurors "may not be questioned about the
5    deliberative process . . . nor can such information be considered by the trial or
6    appellate courts." United States v. Bagnariol, 665 F.2d 877, 884-85 (9th Cir.
7    1981); United States v. Pimentel, 654 F.2d 538, 542 (9th Cir. 1981); Traver v.
8    Meshriy, 627 F.2d 934, 941 (9th Cir. 1980). However, a juror may testify about
9    extrinsic evidence received by the jury. Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th
10   Cir. 1993). "A long line of precedent distinguishes between juror testimony about
11   the consideration of extrinsic evidence, which may be considered by a reviewing
12   court, and juror testimony about the subjective effect of evidence on the particular
13   juror, which may not." Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000).

14   In Claim 14(A), Kimble observes that at the time of his trial in 1980, no
15   California prisoner had been executed since 1967, and the governor of California,
16   Jerry Brown, publicly opposed capital punishment. The public was aware that
17   formerly death-sentenced defendants, such as Charles Manson, regularly came up
18   for parole hearings. Several of Kimble's jurors allegedly explained, after his trial
19   was over, that they were concerned that if they did not give Kimble the death
20   penalty, he might also be eligible for parole. Although the jury was instructed that
21   the only alternative to a death sentence for Kimble was "confinement in the state
22   prison for life without the possibility of parole," (13 R.T. 3384), they allegedly
23   failed to understand the import of this instruction. In support of this claim,
24   Kimble cites statements of six jurors that the jurors were concerned about the
25   possibility of Kimble being released from prison, and discussed this issue
26   extensively during their penalty deliberations.

27   There is no need for a hearing on this claim, because there is no admissible
28   evidence to support it. Kimble argues that the jurors' awareness that other

87

1    prisoners in California routinely came up for parole hearings and that no one had

2    been executed constituted an impermissible extraneous influence on the jurors.

3    But the "general knowledge, opinions, feelings and bias that every juror carries

4    into the jury room" does not constitute an "extraneous influence" within the

5    meaning of Rule 606(b). McDowell, 107 F.3d at 1367 (citation and internal

6    quotation marks omitted). Because no admissible evidence supports this claim, it

7    must be denied. See id. at 1367-68.

8         Claims 14(B), 14(C), 14(D), and 14(F) suffer from the same infirmity. In

9    Claim 14(B), Kimble alleges that during their penalty deliberations, the jurors

10   considered what would happen if they failed to agree on a verdict. Although some

11   jurors favored a life sentence, others favored death, and the jurors discussed their

12   concern that both the guilt and penalty phases would have to be retried if they

13   could not agree. This is why they sent a note asking what the court would do if

14   they could not agree. (See Clerk's Tr. 376.) Kimble argues that the jurors

15   improperly permitted these legally irrelevant considerations to influence their

16   deliberations and affect their penalty verdict.

17        In Claim 14(C), Kimble alleges the jurors believed they needed to impose

18   the death penalty in order to ensure that Kimble would remain on death row for the

19   rest of his life. They discussed the fact that Jerry Brown was governor, and

20   opposed capital punishment. They were concerned that a life sentence might mean

21   that Kimble would someday be eligible for parole.

22        In Claim 14(D), Kimble contends some members of the jury refused to

23   consider his mitigating evidence. One juror allegedly said that upon concluding

24   Kimble was guilty, she decided he unquestionably deserved a death sentence.

25   During the penalty deliberations, some jurors allegedly argued that under the

26   court's instructions, they were barred from considering any of the defense

27   evidence about Kimble's character and background, since it did not "extenuate[]

28   the gravity of the crime." (Clerk's Tr. 365.) Because the jurors erroneously

88

1 concluded that this mitigating evidence did not fit the factors listed by the judge

2 for their consideration, they allegedly disregarded it.

3       In Claim 14(F), Kimble alleges that during the guilt and penalty phase

4 deliberations, several jurors discussed evidence that the trial court had ruled

5 inadmissible,[30] expressed concern about Kimble's failure to testify in his own

6 defense, and considered Kimble's unemotional and apparently unconcerned

7 demeanor as evidence against him.

8       All of these claims would require the Court to scrutinize the jury's internal

9 deliberations.  The jurors' statements about what they thought and discussed, and

10 their motives for voting for a death sentence, are inadmissible.  Fed. R. Evid.

11 606(b); McDowell, 107 F.3d at 1367-68.

12       Similarly, jurors' testimony that they considered Kimble's failure to take the

13 stand is barred by Federal Rule of Evidence 606(b).  United States v. Tran, 122

14 F.3d 670, 673 (8th Cir. 1997); United States v. Friedland, 660 F.2d 919, 927-28 (3rd

15 Cir. 1981).  A defendant's failure to testify is not "extraneous prejudicial

16 information" within the meaning of the rule "because it was known to the jurors as

17 a result of their presence at the trial, not as a result of something disclosed to them

18 that had not occurred in the courtroom."  Tran, 122 F.3d at 673; Friedland, 660

19 F.2d at 927-28.

20       Kimble also attempts to characterize the jurors' perceptions of Kimble's

21 demeanor as "extrinsic evidence" that improperly influenced their deliberations.  It

22 is true that a prosecutor's comments on a defendant's demeanor can violate the

23 defendant's constitutional right "not to be convicted except on the basis of

24 evidence adduced at trial."  United States v. Schuler, 813 F.2d 978, 981 (9th Cir.

25 1987).  But while comment on the defendant's demeanor is improper, the jurors

26 can no more avoid noticing it than they can avoid noticing the fact that a defendant

27

28 [30] Kimble does not specify what inadmissible evidence the jurors purportedly considered, and such a conclusory allegation does not warrant habeas relief.

89

1    did not take the witness stand.  Testimony by jurors that they considered a

2    defendant's demeanor, and that it affected their deliberations, is therefore

3    inadmissible under Rule 606(b).  Cf. Tran, 122 F.3d at 673.

4    **B.    Claim 14(E):  Sleeping Juror**

5         Kimble claims that "[a]t least one juror slept through significant portions of

6    the trial and in so doing failed to fulfill his obligations as a fair, impartial and

7    attentive juror." (2d Am. Pet. at 71.)  This is the entire statement of the claim.  In

8    his offer of proof, Kimble merely quotes another juror as having said, "One juror

9    fell asleep almost everyday during the trial." (Pet'r Supp. Offer at 130.)

10        Presumably, jurors as well as other participants in lengthy trials, nod off or

11   doze from time to time.  Cf. Tanner, 483 U.S. at 125 (juror affidavits showed that

12   "several of the jurors fell asleep at times during the afternoons").  But "the

13   presence of a sleeping juror during trial does not, per se, deprive a defendant of a

14   fair trial." United States v. Olano, 62 F.3d 1180, 1189 (9th Cir. 1995) (citing

15   United States v. Springfield, 829 F.2d 860 (9th Cir. 1987)).  Even if one of

16   Kimble's jurors were shown to have slept during portions of the trial, Kimble's

17   constitutional right to an impartial jury was not violated "if he did not miss

18   essential portions of the trial and was able fairly to consider the case." United

19   States v. Barrett, 703 F.2d 1076, 1083 n.13 (9th Cir. 1983).  Kimble's offer of

20   proof sheds no light on these essential factual issues.  He alleges no facts showing

21   that the juror missed "essential portions of the trial" or was unable to consider the

22   case fairly. Id.  Moreover, the scant evidence offered would be barred by Federal

23   Rule of Civil Procedure 606(b).  Cf. Tanner, 483 U.S. at 125-27 (juror testimony

24   about jurors' use of drugs and alcohol, which led to jurors "falling asleep all the

25   time during the trial," is inadmissible under Rule 606(b)).

26        In his offer of proof, Kimble further alleges that two other jurors were

27   distracted during trial.  He quotes juror Dana Schraeder as saying that "[o]ne

28   woman on the jury had her son or daughter arrested during the trial and was very

1  upset about it." (Pet'r Supp. Offer at 131.)  Ms. Schraeder also allegedly stated:

2

3              After I was picked for the jury but before the trial began,
       my estranged husband was arrested for child molestation. I
4      was still close to him and this was a terrible strain on me. I was
       very upset. I spoke with the police and a psychologist working
5      on my husband's case. I didn't think I could cope with all of
       this and still do my job as a juror. I went to the judge and told
6      him this. I said I couldn't give the case my full concentration
       with all this going on in my life. I met him in his chambers. It
7      was just the two of us. I don't remember any of the lawyers or
       court reporters being there. The judge told me that he wouldn't
8      dismiss me from the jury. He pointed his finger at me and told
       me I couldn't shirk my civic duty.

9  (Pet'r Supp. Offer at 131.)

10      Ms. Schraeder's statement that another juror "had her son or daughter

11 arrested during the trial and was very upset about it" does not warrant a hearing.

12 Even if the news of the arrest constituted "extraneous" information or an "outside

13 influence" within the meaning of Rule 606(b)'s exception, juror testimony would

14 be admissible only to show that this information reached the jury and the degree to

15 which the jury discussed and considered it, not to demonstrate "the subjective

16 effect of the evidence on the particular juror." <u>Sassounian</u>, 230 F.3d at 1108-1109.

17 Clearly, this information was not "extraneous prejudicial information" concerning

18 Kimble's case. Fed. R. Evid. 606(b); <u>cf.</u> <u>Sassounian</u>, 230 F.3d at 1109. Kimble

19 does not allege that the jurors even discussed this arrest; he simply claims that the

20 affected juror was "very upset." This allegation is conclusory, and for that reason

21 does not warrant a hearing; moreover, additional testimony that the juror was so

22 upset that she was unable to deliberate competently would be barred by Rule

23 606(b). <u>Tanner</u>, 483 U.S. at 126-27.

24      Ms. Schraeder's description of her own husband's arrest and her subsequent

25 conversation with the trial judge present a different issue. The question is not

26 whether Ms. Schraeder's personal anguish prevented her from subsequently

27 performing her duties as a juror. Ms. Schraeder's testimony about her own

28 emotional state during trial and how that affected the deliberations is barred by

91

1   Rule 606(b). Instead, this allegation concerns an *ex parte* contact between a juror

2   and the trial judge.

3          The Supreme Court has explained that "'the mere occurrence of an *ex parte*

4   conversation between a trial judge and a juror does not constitute a deprivation of

5   any constitutional right. The defense has no constitutional right to be present at

6   every interaction between a judge and a juror, nor is there a constitutional right to

7   have a court reporter transcribe every such communication.'" United States v.

8   Gagnon, 470 U.S. 522, 526 (1985) (quoting Rushen v. Spain, 464 U.S. 114, 125-

9   26 (1983) (Stevens, J., concurring in the judgment)). "When an *ex parte*

10  communication relates to some aspect of the trial, the trial judge generally should

11  disclose the communication to counsel for all parties." Rushen, 464 U.S. at 119.

12  Nevertheless, a trial court's failure to disclose such a communication is subject to

13  harmless error analysis. Id. at 118-19.

14         Kimble has simply tossed this statement by Juror Schraeder into his offer of

15  proof, in support of his claim that another juror slept through portions of the trial.

16  Kimble draws no connection between the juror's *ex parte* conversation with the

17  judge and her subsequent behavior on the jury. According to Ms. Schraeder, the

18  judge merely told her she must remain on the jury and perform her civic duty.

19  While she expressed concern in advance that she might not be able to "give the

20  case my full concentration," she does not say that she was ultimately unable to

21  perform her duties as a juror. (Pet'r Supp. Offer at 131.) Kimble has failed to

22  allege any facts that would demonstrate prejudice from the *ex parte* contact. There

23  is no need for an evidentiary hearing on these allegations.

24      **C.    Claim 14(G): Juror Bias**

25         Kimble claims that juror Ernest Bray misrepresented material information

26  during voir dire. The prospective jurors were informed that Kimble was charged

27  with armed robbery in addition to murder and other charges. They were asked

28  whether they or anyone close to them "ever suffered a similar charge as to those in

1  this case." (2 R.T. 230, 236.) Mr. Bray said only that one of his sons was not
2  living at home and was employed doing "menial type tasks." (4 R.T. 913-14.) In
3  fact, Kimble alleges, Mr. Bray's son, who was approximately the same age as
4  Kimble, was at that time serving a sentence of three years in prison for two counts
5  of armed robbery.
6      "The Sixth Amendment guarantees a criminal defendant a verdict by
7  impartial, indifferent jurors. The bias or prejudice of even a single juror would
8  violate [the defendant's] right to a fair trial." Dyer v. Calderon, 151 F.3d 970, 973
9  (9th Cir. 1998) (en banc). Because the voir dire process is the primary method for
10 ensuring that the jurors will be impartial, "[t]he necessity of truthful answers by
11 prospective jurors if this process is to serve its purpose is obvious." McDonough
12 Power Equip. v. Greenwood, 464 U.S. 548, 554 (1984); Dyer, 151 F.3d at 973.
13 Nevertheless, not every misstatement by a juror during voir dire requires a new
14 trial. Prospective jurors sometimes forget, misunderstand a question, or "bend the
15 truth a bit to avoid embarrassment." Dyer, 151 F.3d at 973. Even an intentionally
16 dishonest answer to a voir dire question does not mean that the juror is biased, "so
17 long as the falsehood does not bespeak a lack of impartiality." Id.; McDonough
18 Power Equip., 464 U.S. at 555-56. The Supreme Court has held that to obtain a
19 new trial, "a party must first demonstrate that a juror failed to answer honestly a
20 material question on voir dire, and then further show that a correct response would
21 have provided a valid basis for a challenge for cause." McDonough Power Equip.,
22 464 U.S. at 556.
23     The Court of Appeals for the Ninth Circuit has analyzed juror bias under
24 two theories: actual bias and implied bias. Fields v. Woodford, 281 F.3d 963, 972
25 (9th Cir. 2002); United States v. Gonzales, 214 F.3d 1109, 1111-13 (9th Cir. 2000).
26 The most clear-cut cases of actual bias are those in which prospective jurors admit
27 that because of their own personal experiences, they are unable to be impartial.
28 See Gonzalez, 214 F.3d at 1111-12. The determination of whether a juror is

93

1 | actually biased is a question of fact, and reviewing courts typically accord great
2 | deference to trial court findings on this question.  Id.  In contrast, juror bias is
3 | implied by the circumstances if "an average person in the position of the juror in
4 | controversy would be prejudiced."  Id. at 1112 (quoting United States v. Cerrato-
5 | Reyes, 176 F.3d 1253, 1260-61 (10th Cir. 1999)) (emphasis removed).  For
6 | example, where a juror "has had some personal experience that is similar or
7 | identical to the fact pattern at issue in the trial or where the juror is aware of highly
8 | prejudicial information about the defendant," the courts will find implied bias.  Id.
9 | A finding of implied bias presents a mixed question of fact and law.  Id.

10 |      In Dyer, the Ninth Circuit concluded that a juror who repeatedly lied about
11 | her past in order to serve on the jury was impliedly biased.  Dyer, 151 F.3d at 984.
12 | "Whether the desire to serve is motivated by an overactive sense of civic duty, by
13 | a desire to avenge past wrongs, by the hope of writing a memoir or some other
14 | unknown motive, this excess of zeal introduces the kind of unpredictable factor
15 | into the jury room that the doctrine of implied bias is meant to keep out."  Id. at
16 | 982; accord Green v. White, 232 F.3d 671, 677 (9th Cir. 2000).

17 |      Jury selection for Kimble's trial began October 14, 1980, and ended
18 | November 5, 1980.  After hardship excusals were completed, twelve potential
19 | jurors were selected from the panel and seated in the jury box.  (2 R.T. 223-24).
20 | Ernest Bray was seated in the courtroom along with the entire jury panel, but was
21 | not initially called to sit in the jury box.  The judge announced, "Although I am
22 | addressing myself to the ladies and gentlemen who are in the jury box, those in the
23 | audience are to be particularly attentive, because I too am addressing you in these
24 | remarks."  (2 R.T. 224).  The judge then read the entire list of charges against
25 | Kimble, informing the prospective jurors that Kimble was charged with murder,
26 | burglary, robbery, rape, use of a firearm, and other offenses.  (2 R.T. 225-33).

27 |      The judge next asked the prospective jurors in the box, "Have any of you, or
28 | has anyone close to you, ever suffered a similar charge as to those in this case?"

94

1    The prospective jurors in the box answered in the negative. (2 R.T. 236).  The

2    judge then explained that the attorneys were required to ask the prospective jurors

3    numerous personal questions "for the purpose of determining your qualifications

4    to sit as a trial juror in this case,"and asked them not to take offense. (2 R.T. 237).

5    All the jurors not seated in the jury box (including Mr. Bray) were then told to

6    wait outside in the jury room. (2 R.T. 241.)

7         The jurors in the box were then separately questioned about their views of

8    the death penalty, outside the presence of all other jurors. (2 R.T. 242-446.) After

9    this process was concluded, the trial court assembled the twelve potential jurors in

10   the box and allowed the attorneys to conduct a general voir dire.  The other

11   prospective jurors (including Mr. Bray) observed from the audience. (See 2 R.T.

12   447-48.)  As potential jurors in the box were excused for cause and by peremptory

13   challenge, other individuals were drawn from the audience to replace them.  (See,

14   e.g., 3 R.T. 501, 573.)  These replacement jurors were then individually questioned

15   about their views of the death penalty, outside the presence of all other potential

16   jurors. (See, e.g., 3 R.T. 501-11, 573-75.)  If the new juror was not excused for

17   cause based on her views of the death penalty, then all the other prospective jurors

18   were summoned back into the courtroom to observe the new prospective juror

19   undergo general voir dire. (See, e.g., 3 R.T. 511, 581-82.)

20        Initially, the judge commenced the general voir dire of a replacement juror

21   by asking whether she had heard the questions asked of the other members of the

22   panel, and if so, whether her answers would be "the same or different." (3 R.T.

23   512.) The judge also repeated several of the standard questions, such as, "Have

24   you ever known anyone to suffer a similar charge?" (3 R.T. 512.) The judge

25   subsequently adopted a truncated method of questioning replacement jurors,

26   simply inquiring whether they heard the questions asked of the other potential

27   jurors, and whether their answers were different. (See, e.g., 3 R.T. 582-83, 612,

28   768.)

1    Mr. Bray was presumably in the audience over the course of the many days

2    of voir dire that occurred before October 29, 1980, when he was called to replace a

3    juror who was excused by peremptory challenge. (Clerk's Tr. 230; 4 R.T. 904.)

4    Mr. Bray was brought into the judge's chambers for the death qualification voir

5    dire. He confessed he had not previously thought about what his attitude would be

6    if he were a juror in a capital case, but he said he was "just fascinated just

7    watching the judicial process." (4 R.T. 904-906.) Mr. Bray was not challenged

8    for cause, and so was brought back into the courtroom and seated in the jury box

9    along with the other prospective jurors. (4 R.T. 911-12.) The judge then asked,

10   "Mr. Bray, did you hear the questions I asked of the other members of the panel?"

11   Mr. Bray responded, "Yes, I did." The judge asked, "If I asked you the same

12   questions would your answers be the same, similar, or different?" Mr. Bray

13   responded, "Similar." The judge then elicited the fact that Mr. Bray was a pre-

14   school teacher who was married with four children, and turned the questioning

15   over to counsel. (4 R.T. 912.)

16       Defense counsel asked Mr. Bray about his children. Mr. Bray said he had a

17   daughter who was 23, and "one that is 21, a son that's 19, will be 20 December the

18   20th, and one 15."

19
20   Mr. Walton:   The 15-year-old, I assume, is still in school?

21   Mr. Bray:     Yes.

22   Mr. Walton:   What about the others?

23   Mr. Bray:     They're working.

24   Mr. Walton:   What kind of work do they do?

25   Mr. Bray:     My daughter works for Western Union. The other one is a
                   telephone operator in the great land of development, Pine
26                 Bluff, Arkansas, and the other one he does menial type tasks.

27   Mr. Walton:   That's the 19-year-old?

28   Mr. Bray:     Yes.

     Mr. Walton:   But none of them around the house, I suppose?

| | |
|---|---|
| Mr. Bray: | No. |
| Mr. Walton: | Now, based on what you do know about this case do you think you would be a fair and competent juror if you were selected? |
| Mr. Bray: | Yes. |
| Mr. Walton: | Is there any reason you can think of why you shouldn't be a juror on this case? |
| Mr. Bray: | No. |

(4 R.T. 913-14.)  The prosecutor then asked, "Mr. Bray, obviously, your 19-year old son is approximately the same age as the defendant.  Would you have difficulty keeping your son's youth and the defendant's separated and completely out of your consideration in the guilt phase of the trial?"  Mr. Bray answered simply, "No," and his son was not mentioned again.  (4 R.T. 916.)

Kimble alleges that public records reveal that on March 4, 1980 — eight months before Mr. Bray was questioned — Mr. Bray's son, Ernest Bray, Jr., was sentenced to three years imprisonment, following his conviction on two counts of armed robbery.

Both the Supreme Court and the Ninth Circuit have held that where substantial questions are raised about a juror's impartiality, it may be necessary to hold a hearing to determine whether the juror was impartial.  See Williams, 529 U.S. at 440-42; Fields, 281 F.3d at 974.  If the juror's misconduct is brought to light during or shortly after trial, the state trial court generally will have an opportunity to hold a hearing and resolve the issue.  See, e.g., Smith v. Phillips, 455 U.S. 209, 217-218 (1982); Pope v. Man-Data, Inc., 209 F.3d 1161, 1163 (9th Cir. 2000); Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990).  But if no hearing was held by the state courts, it may be necessary for the federal courts to hold a hearing and determine the facts in the first instance.  Fields, 281 F.3d at 972-74; cf. Dyer, 151 F.3d at 974-79.

In this case, Mr. Bray revealed nothing during voir dire that permitted the trial court to determine whether he was biased.  Hence, there are no state court

1  findings of fact on the question of Mr. Bray's partiality.  Mr. Bray appears to have

2  concealed the fact that his son was in prison for armed robbery, during a voir dire

3  whose purpose was to determine Mr. Bray's qualifications to serve as a juror in a

4  trial in which the defendant was also accused of armed robbery.  An evidentiary

5  hearing is necessary to determine why Mr. Bray answered the voir dire questions

6  as he did and whether he was an impartial juror.  <u>Fields</u>, 281 F.3d at 974.

7     **D.    Claim 14(H):  A Juror's Husband Accompanied the Jury**

8        Kimble claims that the husband of juror Alice Minkler was present in the

9  courtroom throughout the trial.  The jurors were not sequestered during the guilt

10 phase, but when they were subsequently sequestered during the penalty phase, "the

11 court allowed Mr. Minkler to join his wife for lunch." (2d Am. Pet. at 71.)  This is

12 the entire statement of the claim, and Kimble does not elaborate on it in his offer

13 of proof.

14       The record of the jury voir dire reveals that Mrs. Minkler was a

15 grandmother who lived with her husband, who had retired eleven years before

16 Kimble's trial. (3 R.T. 761, 768.)  Kimble does not claim it was improper to allow

17 Mr. Minkler to observe the trial.  Although the record does not reveal it, it appears

18 likely that Mr. Minkler accompanied his wife to and from the trial, and lunched

19 with her, and possibly other jurors, during the guilt phase while the jury was not

20 sequestered.  Kimble alleges nothing about these matters.  He claims only that

21 once the jurors were sequestered during the penalty phase, the court should not

22 have allowed Mr. Minkler "to join his wife for lunch." (2d Am. Pet. at 71.)

23       The penalty phase began on Tuesday, January 6, 1981, and closing

24 arguments were presented on Wednesday. (Clerk's Tr. 354-55.)  The jurors were

25 instructed the next morning, Thursday, January 8, 1981.  They retired to begin

26 deliberating at 9:45 a.m. (Clerk's Tr. 356.)  As is customary, a bailiff was sworn

27 to "take charge of the jury and keep them together . . . [and not] allow anyone else

28 to speak to them on any matter connected with this case . . . ." (13 R.T. 3388.)

98

The jurors assembled in court again shortly before noon.  The judge informed them that they would be sequestered during lunch, and that two bailiffs would escort them and pay for their lunch.  The jurors were told that they would not be sequestered overnight, just during the lunch period.  After swearing the second bailiff, the judge said, "[T]he alternates will also go.  Mr. Minkler, you may go too, if you wish, but you will have to be kept away from the rest of the jurors." (13 R.T. 3388-A-B; Clerk's Tr. 356.)  The jury left for lunch, and resumed their deliberations at 1:40 p.m.  (Clerk's Tr. 356.)

Kimble does not allege that the bailiffs failed to uphold their duty to prevent anyone from speaking to the jurors about the case.  He does not allege that Mr. Minkler sat with his wife, or even spoke with his wife or any other jurors during lunch.  The trial court clearly stated in the bailiffs' presence and in the presence of all the jurors that Mr. Minkler must be kept separate from the jurors.  There is no reason to suspect these instructions were disregarded.  These allegations do not establish a constitutional violation.

## X.   Constitutionality of California's Death Penalty Law

In Claim 31, Kimble asserts that California's death penalty statute is unconstitutional.  The claim is not a facial challenge to the constitutionality of the death penalty in California, but a challenge to the law as it has been applied since 1977.  Kimble argues that California's death penalty law is unconstitutional because it does not provide for appellate intercase proportionality review, fails to rationally narrow the class of murderers to those who receive the death penalty, and violates the Equal Protection Clause by drawing irrational distinctions between capital and non-capital trials and irrationally discriminating between those who receive the death penalty and those who do not.  Kimble also claims his own death sentence is not proportionate to his individual culpability, or to the punishment assessed against similarly situated individuals.

In his offer of proof, Kimble offers to prove these allegations with a

99

1   statistical analysis of "the 300 decisions in California murder cases published

2   during the years 1988-1992." Based on this sample of 300 published cases,

3   Kimble asserts that in the overwhelming majority of cases, whether capital or not,

4   the prosecution could have alleged a special circumstance that would have made

5   the case a capital case. (See Pet'r Supp. Offer at 134.)

6       Kimble overlooks that he was tried and sentenced under the 1977 death

7   penalty law, which contained only seven special circumstances. The number of

8   special circumstances was greatly expanded by the 1978 law, enacted by the

9   Briggs Initiative, as well as by other more recent voter initiatives. See Pulley v.

10  Harris, 465 U.S. 37, 51 n.13 (1984). Even if California's death penalty law has

11  become unconstitutional as a result of these changes, Kimble would not be entitled

12  to relief unless he could demonstrate that the 1977 law, as applied, suffers from

13  the same infirmities. The 1977 law was in effect for only fifteen months, from

14  August 11, 1977, through November 7, 1978. See People v. Murtishaw, 48 Cal.

15  3d 1001, 1025 (1989); People v. Teron, 23 Cal. 3d 103, 116 (1979)

16      Kimble's complaint that California law is unconstitutional because it fails to

17  provide for intercase proportionality review has been rejected by the United States

18  Supreme Court. Harris, 465 U.S. at 50-51.

19      Kimble's argument that his sentence is disproportionate to his crimes is

20  frivolous. If he is indeed guilty, as the jury found, of a double murder committed

21  in the course of a robbery and a rape, then Kimble must do more to show that the

22  death sentence is not proportionate to such a crime. He cites no other cases, and

23  makes no effort to show that it is unusual in California to impose the death penalty

24  for two murders committed under such circumstances. Cf. Enmund, 458 U.S. at

25  797 (death penalty is disproportionate punishment for defendant "who does not

26  himself kill, attempt to kill, or intend that a killing take place or that lethal force

27  will be employed"); Coker v. Georgia, 433 U.S. 584 (1977) (death penalty

28  disproportionate punishment for rape).

1  Kimble's allegation that the California statute violates equal protection

2  principles because "[p]rotections applicable to non-capital defendants are

3  suspended in capital proceedings" is conclusory. He cites no examples of any

4  such differences.

5  The Supreme Court and the Ninth Circuit have previously upheld

6  California's 1977 law over facial challenges claiming the statute does not provide

7  the jury sufficient guidance in choosing between life and death. See Harris, 465

8  U.S. at 51-54; Williams, 52 F.3d at 1484. Kimble instead challenges the allegedly

9  unconstitutionally broad discretion the law vests in prosecutors to decide whether

10  or not to charge a murder as a capital case. As the Supreme Court has explained,

11  however, this argument is "antithetical to the fundamental role of discretion in our

12  criminal justice system." McCleskey v. Kemp, 481 U.S. 279, 311 (1987). "[T]he

13  capacity of prosecutorial discretion to provide individualized justice is firmly

14  entrenched in American law," and "a capital punishment system that did not allow

15  for discretionary acts of leniency would be totally alien to our notions of criminal

16  justice." Id. at 311-12 (citations and internal quotation marks omitted); accord

17  Harris v. Pulley, 885 F.2d 1354, 1374 (9th Cir. 1988). Because "[p]rosecutorial

18  decisions necessarily involve both judgmental and factual decisions that vary from

19  case to case, . . . it is difficult to imagine guidelines [for prosecutors] that would

20  produce [predictability] without sacrificing the discretion essential to a humane

21  and fair system of criminal justice." McCleskey, 481 U.S. at 313 n.37.

22  Although Kimble alleges cursorily that California prosecutors exercise their

23  discretion "in an arbitrary and capricious manner, . . . based upon inconsistent and

24  undisclosed criteria," he offers no specific facts in support of this claim. Because

25  prosecutorial discretion is essential to the criminal justice process, federal courts

26  "demand exceptionally clear proof before [inferring] that the discretion has been

27  abused." Id. at 297. The Constitution does not require prosecutors to disclose the

28  criteria they use when deciding whether to seek the death penalty. See United

101

1  States v. Fernandez, 231 F.3d 1240, 1246-48 (9th Cir. 2000).  Claim 31 must be
2  denied.
3  **XI.  Discovery Motions**
4          It appears likely that some discovery will be necessary before an evidentiary
5  hearing may commence.  See generally Bracy v. Gramley, 520 U.S. 899, 908-909
6  (1997); Harris v. Nelson, 394 U.S. 286, 298-300 (1969); Jones, 114 F.3d at 1009.
7  The parties' cross-motions for discovery were briefed without the benefit of the
8  Bracy and Jones decisions, and before the parties knew the scope of the
9  evidentiary hearing to be held in this case.  Moreover, the Court has in the interim
10  revised its local rules governing procedures in capital habeas corpus cases.  See
11  Local Rule 83-17 (effective October 1, 2001).  Under these circumstances, the
12  parties should meet and confer in a good faith effort to agree on discovery that will
13  facilitate the efficient presentation of evidence at the evidentiary hearing, and
14  submit their discovery requests by way of a joint discovery request pursuant to
15  Local Rule 83-17.7(f).  The Court will hold a case management conference to
16  discuss an appropriate schedule for filing the joint discovery request.
17  **XII.  Order**
18          For the foregoing reasons, the Court hereby orders as follows:
19          1.      Petitioner's Motion for an Evidentiary Hearing is **GRANTED IN**
20  **PART**.  The Court will hold an evidentiary hearing on Claims 1-5, the aspect of
21  Claim 6(B) relating to benefits conferred on Ortez Winfrey, Claim 6(C), Claim
22  7(C), Claim 10(B), the aspect of Claim 10(C) alleging deficient performance by
23  counsel during jury voir dire, the aspect of Claim 10(D) alleging ineffective
24  assistance of counsel in the handling of forensic evidence bearing on the rape
25  charge and the participation of accomplices, Claim 10(E), the aspect of Claim
26  10(H) alleging deficient performance by counsel in objecting to certain proposed
27  instructions, the aspect of Claim 10(I) alleging deficient performance by counsel
28  in his penalty phase argument, and Claim 14(G).  In all other respects, the motion

102

1  is **DENIED**.

2       2.    Claim 7(A, B, D, I, K), Claim 9, Claim 10(F, G), Claim 14(A, B, C,

3  D, E, F, H), Claim 31, and Claim 35 of the Second Amended Petition are

4  **DENIED**.

5       3.    Petitioner's and Respondent's Motions for Leave to Conduct

6  Discovery are **DENIED WITHOUT PREJUDICE**.

7       4.    The parties shall appear for a case management conference on

8  Monday, October 21, 2002, at 9:30 a.m. to discuss a discovery schedule and any

9  other matters relating to the evidentiary hearing.

10       5.    In order to initiate case budgeting as recommended by the Judicial

11  Council of the Ninth Circuit, the Court will issue a separate order outlining

12  procedures for future budgeting of petitioner's counsel's services in this case.

13       6.    The copy of the state court record lodged with the Court by

14  respondent is missing certain pages.  Accordingly, within thirty days of this order,

15  respondent shall lodge with the Court copies of the following pages from the trial

16  transcript: 7 R.T. 1616, 1634, 1687, 1688; 8 R.T. 1916, 1966; and 13 R.T. 3321.

17       IT IS SO ORDERED.

18

19  Dated:  September _17_, 2002.

20                                 STEPHEN V. WILSON
                               United States District Judge

21

22

23

24

25

26

27

28